No. 02-426

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 195

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

ALICIA MARLENE STRAUSS,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC-01-17,
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        John O. Putikka, Attorney at Law, Thompson Falls, Montana

        For Respondent:

        Honorable Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

        Robert Zimmerman, County Attorney, Thompson Falls, Montana

Submitted on Briefs:  March 20, 2003

Decided:  August 4, 2003

Filed:

_____
                  Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Following a jury trial in the Twentieth Judicial District Court, Sanders County, Alicia Marlene Strauss was convicted of negligent homicide and was sentenced to twenty years imprisonment, with ten years suspended. Strauss received an additional ten-year prison term for her use of a weapon during the commission of the offense. She now appeals. We affirm in part and reverse in part.

¶2 The following issues are raised on appeal:

¶3 (1) Whether the District Court erred when it admitted two video tape recordings of the crime scene, one of which included an audio portion and one that depicted the positions of Strauss and the victim, Brown, relative to their surroundings at the time the crime was committed;

¶4 (2) Whether the District Court erred when it allowed Nancy Wickham to testify at trial about a statement made by Strauss, which was not disclosed to Strauss before the proceedings;

¶5 (3) Whether the District Court erred when it instructed the jury that voluntary intoxication is not a defense to a crime; and

¶6 (4) Whether the District Court erred when it sentenced Strauss to an additional ten years imprisonment pursuant to a weapon enhancement statute, the provisions of which were not complied with by the State or the court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 On May 8, 2001, Appellant, Alicia Marlene Strauss, shot and killed her boyfriend, Douglas Brian "Popeye" Brown, during an argument at Brown's residence in the McLaughlin Creek area near Paradise in Sanders County. After shooting Brown, Strauss called 911. She told the dispatcher that the shooting was an accident. Police officers and paramedics arrived at the scene and attempted to save Brown's life. Their efforts were to no avail, and Brown was later transported to the Clark Fork Valley Hospital in Plains where he was pronounced dead. A pathologist determined that the cause of death was a gunshot wound to Brown's trunk, where a bullet had penetrated his liver.

¶8 Strauss was charged by Information with deliberate homicide. At Strauss's arraignment, the Twentieth Judicial District Court, Sanders County, entered a plea of not guilty on her behalf.

¶9 On the first day of trial, the State notified Strauss that one of its witnesses, Nancy Wickham, intended to testify about a statement that Strauss had made on the evening of the shooting. Wickham had informed the State that, according to Strauss, Brown told her to claim that she was only shooting at birds when the "accident" occurred. The parties met in chambers to discuss the admissibility of this proposed testimony. The State requested that the jury be allowed to hear the testimony. Strauss protested, asking for a mistrial on grounds that police officers never formally interviewed Wickham, and that her testimony was never disclosed. Strauss noted that she had interviewed Wickham several weeks prior to trial, and that Wickham had failed to disclose the alleged statement. The District Court refused to

3

grant a mistrial, but stated that it would not allow Wickham to be called as a witness by the State until Strauss had an opportunity to interview her.

¶10    The parties held a second meeting the following morning, and Strauss again urged the court to preclude Wickham from testifying about Brown's statement. In the alternative, Strauss asked the court to continue the proceedings for two weeks to allow her time to investigate Wickham's background for impeachment purposes. Strauss maintained that the introduction of Wickham's testimony would result in a denial of Strauss's right to present a defense. Again, the court denied Strauss's requests, and Wickham was allowed to testify.

¶11    During the course of the trial, the State attempted to show that Strauss had shot Brown deliberately. The State produced additional witness testimony that Strauss had admitted shooting Brown during an argument. The State also produced evidence that, immediately after the shooting, Strauss called several family members before calling 911. Physical evidence collected at the scene revealed that the rifle used by Strauss had discharged five bullet casings in a concentrated area. In turn, Strauss relied on the testimony of the State's witnesses to support her general argument that the shooting was accidental.

¶12    During the testimony of Deputy Sheriff Chad Cantrell, the State presented two video tape recordings of the crime scene. Strauss objected to both. The first video tape, marked as State's Exhibit Number 17, included an audio portion consisting of Officer Cantrell's contemporaneous statements regarding the location of Strauss and Brown at the time of the shooting. Strauss argued that Cantrell's recorded comments amounted to a narration by the officer which was testimonial in nature and not made under oath or subject to cross-

4

examination. Strauss requested that the recording be played with the volume turned down. In response, the State noted that because Officer Cantrell was on the stand, he was subject to cross-examination regarding his recorded statements.

¶13    The second video tape, marked as State's Exhibit Number 18, was made several weeks after the shooting. The recording showed an individual positioned where the police believed Brown was standing at the time of the shooting. The recording also showed a house, bullet casings, and a road as viewed from several locations. In addition, the camera operator walked back and forth between the house and the location of the shooting. Strauss objected to this video tape on grounds that it was an impermissible re-enactment of the State's theory of the case and depicted scenes that no one except Strauss and Brown had witnessed. Strauss also noted that the conditions at the time of the recording were different from the conditions of the shooting. For example, certain objects had been moved or were no longer there when the video tape was made. In response, the State argued that the tape would help the jury understand where the bullet casings and the house and road were located. The State also asserted that it was important to demonstrate distances and time lapses to the jury.

¶14    The District Court admitted both video tapes over Strauss's objections. The court specifically determined that the second tape was not a re-enactment. However, the court promised to instruct the jury that the person seen in the video was not the victim and was not intended to represent the victim. The tapes were then played for the jury. The first tape was played with the audio portion. The second tape was played without the promised admonitory

instruction. In addition, both tapes were admitted into the jury room at the conclusion of the trial so that the jury could view the recordings again.

¶15 Early in the settling of instructions, Strauss objected to the State's proposed Instruction Number 10, entitled "Responsibility–Intoxicated Condition." The instruction provided that intoxication could not be taken into account when determining the existence of a mental state which was an element of Strauss's offense. Strauss argued that the instruction was confusing and prejudicial because it implied that she was trying to use intoxication as a defense. According to Strauss, the instruction violated her right to due process and a fair trial. The District Court overruled Strauss's objection and gave the jury instruction as Instruction Number 15.

¶16 The jury returned a verdict of guilty of the lesser included offense of negligent homicide. The State recommended that Strauss be sentenced to twenty years imprisonment for the underlying conviction, with an additional ten years imprisonment for her use of a firearm during the commission of the offense. Strauss objected to the sentence enhancement and argued that she had not been informed of the State's intention to seek the enhancement and that the State had not presented legal authority to support its imposition. In turn, Strauss recommended a ten-year suspended sentence.

¶17 The District Court sentenced Strauss to twenty years imprisonment, ten of which the court suspended. The court imposed an additional ten years imprisonment pursuant to the weapon enhancement and directed that the sentences run consecutively. Strauss then appealed.

## DISCUSSION

### Issue One

¶18    We first consider whether the District Court erred when it admitted two video tape recordings of the crime scene, one of which included an audio portion, while the other depicted the positions of Strauss and Brown relative to their surroundings at the time the crime was committed. Our standard of review of a trial court's evidentiary rulings is for abuse of discretion. Trial courts have broad discretion to determine whether evidence is relevant and admissible and, absent a showing of abuse of discretion, these determinations will not be overturned. *State v. Osborne*, 1999 MT 149, ¶ 23, 295 Mont. 54, ¶ 23, 982 P.2d 1045, ¶ 23.

### A.    *State's Exhibit Number 17*

¶19    The first video tape, which included Officer Cantrell's commentary, was offered to enhance the jury's perception of the crime scene or, as the State noted, to "assist them [the jurors] in getting the lay of the land, being able to see the rock sled, the rock cart itself and the road and sleigh and the tree, and that type of thing, where the victim was found and where you [Cantrell] found the blood . . . ." The tape was made two days after the shooting, and shows the location of the incident, including Brown's cabin, driveway, and the positions of Brown and Strauss at the time of the shooting, which investigators determined by the location of blood spatterings and .22 caliber bullet casings. Cantrell's statements, which he made while filming the scene, and which are audible on the recording, include the following:

7

[W]e believe that is where Doug Brown was standing at the time of the incident.

. . . .

This is where we believe Mr. Brown was standing at the time of the incident.

. . . .

You can see from where we are standing at the point we believe the shots were fired to the sled where Mr. Brown was standing that there is a definite increase in elevation. And that increase has yet to be determined at this time.

¶20 Over Strauss's objection, the District Court allowed the video tape to be admitted into evidence and played for the jury. The court also permitted the jury to hear the audio portion. The court observed that Officer Cantrell was subject to cross-examination on the stand and concluded that this was "sufficient to guarantee" that Strauss's defense would not be impeded by the recorded statements.

¶21 On appeal, Strauss argues that by allowing the jury to watch the video tape with the audio portion, the District Court effectively denied her the opportunity to object to any of Cantrell's recorded statements, which she characterizes as unsworn testimony. Strauss contends that the opportunity to cross-examine Cantrell after the tape was played was of little use since the jury had already listened to Cantrell's commentary, and had already heard his potentially damaging remarks. Although Strauss concedes that the video enhanced the jury's conception of the crime scene, she maintains that Cantrell's commentary had no probative value, particularly with respect to how the incident transpired.

¶22 We agree with Strauss that the District Court should have admitted the video tape without sound. Cantrell's recorded commentary may best be characterized as the prior

8

statement of a non-party witness, which the Montana Rules of Evidence classify as non-hearsay. Specifically, Rule 801(d)(1), M.R.Evid., provides that a prior out of court statement by a witness may be admissible if the witness testifies at trial and is subject to cross-examination concerning the statement, and the statement is either inconsistent with the witness's testimony, or offered to rebut an allegation of fabrication, improper influence or motive, or is one of identification.

¶23 We conclude that although Officer Cantrell was available for cross-examination at trial, the audio portion of the tape was not admissible because the second prong of Rule 801(d)(1) was not satisfied. The recorded commentary was not offered to rebut an allegation of fabrication, improper influence or motive. Nor was it one of identification and, therefore, cannot be characterized as admissible non-hearsay. Although other courts have reached different conclusions regarding the proper procedure for introducing such evidence at trial,[1] we conclude that the better practice here would have been to play the video tape without sound, while allowing Cantrell to testify from the stand as the jury viewed the film.

¶24 This procedure gives the opposing party the opportunity to address and object to each statement individually if offered for the truth of the matter stated. As to the contrary

---

[1]The Alabama Court of Criminal Appeals addressed this issue in *Hooks v. State* (Ala. 1987), 534 So.2d 329, 351, and concluded that video narration is subject to the hearsay rules, and may be challenged on those grounds *unless the narrator is present at trial and available for cross-examination*. The Alabama court based its conclusion on a 1978 Oregon case, *Wilson v. Piper Aircraft Corp.* (1978), 282 Or. 61, 74-76, 577 P.2d 1322, 1330, in which the Oregon Supreme Court ruled that a film depicting mock airplane crashes and which included commentary by experts was inadmissible, as narrated, because those experts were not available for the defendant airline to cross-examine.

procedure, once the jury has heard the entire narration, cross-examination which attempts to discredit individual statements from the narration after-the-fact is much less effective. Moreover, if the narrator is available to testify anyway, there is no legitimate reason for allowing the witness's recorded testimony to simply be played first to the jury–especially where the tapes may be accessible to the jury during deliberations.

¶25 We next determine whether the District Court's error prejudiced Strauss's right to a fair trial. Because the court's error was a trial error, we apply a harmless error analysis and ask whether there is a reasonable probability that the introduction of the audible portions of the video tape contributed to Strauss's conviction. *State v. Van Kirk*, 2001 MT 184, ¶¶ 40, 42, 306 Mont. 215, ¶¶ 40, 42, 32 P.3d 735, ¶¶ 40, 42. Specifically, we must decide whether the State presented admissible evidence that proved the same facts as Cantrell's recorded commentary. *Van Kirk*, ¶ 44.

¶26 Cantrell speculated as to where Strauss and Brown were standing in relation to each other at the time of shooting, basing his conclusions on the location of bullet casings from the .22 caliber rifle and Brown's blood on the ground approximately one hundred yards away. Since Cantrell is a trained crime scene investigator, his inferences were not unreasonable. Nor did his statements relate to any disputed matters at all. The statements were directed only at establishing that Strauss committed the act of shooting Brown. Strauss did not challenge Cantrell's credibility or the accuracy of the narration and, in fact, reiterated much of what the officer had said regarding the location of Strauss and Brown at the time of the shooting. Accordingly, the decision to play the audio portion of the video tape for the

10

jury was harmless beyond a reasonable doubt and did not prejudice Strauss's right to a fair trial.

### B. State's Exhibit Number 18

¶27 We also review the District Court's decision to admit the second video tape recording, which was made two months after the shooting and which depicted the crime scene from the perspective of a person walking from the location of the shell casings to Brown's cabin and back again. The film ends with footage of an individual standing in the place where Brown fell after being shot.

¶28 Again, over Strauss's objection, the District Court allowed the video tape to be played for the jury. The court stated that, as a matter of convenience, the tape provided a more efficient means of presenting the crime scene to the jury–the alternative being to take the jury to the scene itself. According to the court, the film gave the jury an "opportunity to at least understand the locations of all the various items."

¶29 On appeal, Strauss argues that the video tape prejudiced her defense because it was used to prove the State's theory that Brown and Strauss argued and that Strauss retrieved a rifle from inside the cabin and shot Brown while he was walking down the road and away from the property. According to Strauss, the recording depicted the incident from the perspective of the shooter and was, therefore, an impermissible re-enactment of the crime. She also asserts that the tape was cumulative evidence since it showed nothing that was not already shown in the first video tape or in crime scene photographs and diagrams.

11

¶30    Courts considering this issue have followed a general rule that video tape recordings of re-enactments require proper foundation, including authentication and identification. In particular, a recorded re-enactment must accurately portray the event in question, and the party offering the recording must show that the re-enactment was filmed under conditions substantially similar to the circumstances of the actual event. *See, e.g., Pickren v. State* (1998), 269 Ga. 453, 455-56, 500 S.E.2d 566, 569-70; *State v. Leroux* (1990), 133 N.H. 781, 784-85, 584 A.2d 778, 781; *Jackson v. State* (Miss. 1989), 551 So.2d 132, 139. This requirement may be satisfied by presenting the testimony of a witness who was present at the crime. *Morgan v. State* (Ala. 1987), 518 So.2d 186, 189-90 (citations omitted). The preliminary showing of accuracy is important because a filmed re-enactment of a crime can potentially result in prejudice to the defendant. *Leroux*, 133 N.H. at 784, 584 A.2d at 781.

¶31    Applying this standard in *Peschke v. Carroll College* (1997), 280 Mont. 331, 343, 929 P.2d 874, 881, we held that a district court erred when it permitted jurors to view a video tape that depicted the actions of the defendant leading up to the event in question. Peschke, a food service employee at Carroll College, in Helena, was shot by a man who had earlier been ejected from the campus chapel by a priest. Peschke sued Carroll College, alleging negligence. *Peschke*, 280 Mont. at 334-35, 929 P.2d at 876. At trial, the college presented a video tape recording portraying the priest, Father Courtney, in the chapel preparing the altar for Mass, saying the Mass, and then going to his apartment above the chapel to call the police to report that during the Mass, he had ejected an intoxicated individual from the building. *Peschke*, 280 Mont. at 342, 929 P.2d at 881. Peschke challenged the admission

12

of the tape and, on appeal, we determined that the recording should not have been presented to the jury because it depicted only Father Courtney's actions, and not the behavior of the shooter. We reasoned that the depiction was not accurate because it presented a "one-sided version of what transpired." *Peschke*, 280 Mont. at 342-43, 929 P.2d at 881.

¶32 Based on *Peschke*, we conclude that the tape in the present case was a re-enactment of Strauss's crime and was, therefore, subject to the foundational requirements described in *Pickren* and *Leroux*. The tape depicted the State's version of the shooting, and portrayed events that preceded the incident in which Brown was shot. The tape was not, as the State suggests, a mere depiction of the spatial relationship between Strauss and Brown and certain relevant objects such as the cabin and rock sled. Instead, the recording was tailored to demonstrate that Strauss committed the act.

¶33 The State argues that the only purpose of the video tape was to demonstrate distances between Brown's cabin, the location of the bullet casings, and the location of the rock sled where Brown was struck. According to the State, the jury needed this information in order to determine the distances between Strauss and Brown and the cabin. However, this justification is implausible given that the same purpose was substantially served by the first video tape. Rather, the second tape was used to support the State's version of events, and to attach a concrete image to its theory of the case. The recording included a segment in which the camera operator walked back and forth between the cabin and the location of the casings. The State notes that the primary purpose of this footage was to demonstrate the length of time it might have taken to walk from the cabin to the casings and then back again.

13

But the clear implication is that Strauss retrieved a rifle from the cabin, walked to a specific location, and then shot Brown. Likewise, the State's claim that a stand-in for Brown was used to show distances does not explain why the stand-in was oriented with his back to the camera operator, appearing as Brown would have at the time of shooting.

¶34 Because the tape was a re-enactment of Strauss's crime, we conclude that it required a proper foundation, including authentication and identification. Pursuant to this requirement, the State should have established that the tape accurately portrayed the event in question, and that the re-enactment was filmed under conditions substantially similar to the circumstances of the actual event. The State failed to meet its burden by not presenting the testimony of a witness who was present at the crime and who could attest to the accuracy of the film.

¶35 Nonetheless, we find that the District Court's error, in admitting the second video tape, was harmless. The tape was largely cumulative of the first recording which, as we noted, was *not* injurious to Strauss's defense. The information contained in the second tape, namely the segment portraying Strauss as she would have appeared walking between the cabin and the location of the shooting, was not probative of any disputed matter and did not contribute to Strauss's conviction. Since Strauss was only convicted of negligent homicide, the attempt by the State to prove, through the re-enactment video, the higher mental state for deliberate homicide did not prejudice Strauss's defense. Accordingly, the admission of the second video tape was harmless beyond a reasonable doubt. *Van Kirk*, ¶¶ 40-44.

14

### C.    *Availability of the Recordings During Jury Deliberations*

¶36    Strauss also claims that the District Court erred by making both video tapes available to the jury during deliberations.  She cites *State v. Harris* (1991), 247 Mont. 405, 417, 808 P.2d 453, 460, and *State v. Bales*, 1999 MT 334, ¶ 24, 297 Mont. 402, ¶ 24, 994 P.2d 17, ¶ 24, for the proposition that a trial court may not "'submit[ ] testimonial materials to the jury for unsupervised and unrestricted review during deliberations'."

¶37    In response, the State argues that Strauss failed to preserve this claim for appeal because she did not object to the District Court's determination that all exhibits would be made available to the jury during deliberations.  *Welch v. Welch* (1995), 273 Mont. 497, 502, 905 P.2d 132, 136 (declining to review an issue not heard by the trial court).  The record indicates that Strauss did not object to the admission of the tapes into the jury room.  Absent a proper objection informing the District Court of this issue, we conclude that Strauss is precluded from now raising the question on appeal.  *State v. Weeks* (1995), 270 Mont. 63, 85, 891 P.2d 477, 490.  Furthermore, in light of our prior rulings on the admissibility of the first tape, we note that even if the first tape was testimonial in nature, its admission into the jury room constituted harmless error.  The second video tape was not testimonial in nature, and Strauss has not presented an argument in support of her assertion that the tape should not have been available to the jury during deliberations.

## Issue Two

¶38    Next, we consider Strauss's claim that the District Court erred when it allowed Nancy Wickham to testify about an alleged statement that was not disclosed by the State prior to

trial. Our standard of review of a trial court's evidentiary ruling is whether the court abused its discretion. *State v. Bingman*, 2002 MT 350, ¶ 19, 331 Mont. 376, ¶ 19, 61 P.3d 153, ¶ 19. Absent a showing of such abuse, we will not overturn a trial court's decision. *Bingman*, ¶ 19. The same standard of review applies to a trial court's ruling on a motion for continuance. A trial court decides continuance requests in light of the interests of justice and the due diligence of the moving party. *State v. Martinez*, 1998 MT 265, ¶ 22, 291 Mont. 306, ¶ 22, 968 P.2d 705, ¶ 22. If a request for a continuance is reasonable–given all the relevant factors including a defendant's right to a fair trial and effective assistance of counsel–a court's refusal to grant the request amounts to an abuse of discretion. *State v. Borchert* (1997), 281 Mont. 320, 327, 934 P.2d 170, 175.

¶39 On the first day of trial, during an afternoon break, the county attorney disclosed to the District Court that Nancy Wickham, an acquaintance of Strauss and a witness for the State, had indicated that Strauss had made a statement regarding the shooting, which Wickham believed was relevant. According to Wickham, Strauss had stated that before Brown died, he directed Strauss to tell the police that she was shooting at bluebirds when the incident occurred. During an in-chambers discussion, Strauss's attorney argued that if Wickham was permitted to testify about the alleged statement, Strauss would seek a mistrial. The court determined that because Wickham was listed as a witness for the State, and since she was available to be interviewed by Strauss, no discovery violation had occurred. According to the court, the State was not obligated to pull information from Wickham that she failed to provide. The court also noted that the State had agreed to not call Wickham

16

until the following day, and that Strauss would have an opportunity to interview her that evening.

¶40 During a morning conference, on the second day of trial, Strauss again requested a mistrial or, in the alternative, a two-week continuance. Strauss wanted more time to subpoena impeachment witnesses, and to investigate a past incident in which Wickham had lied to police officers about a car accident involving her husband. The District Court denied Strauss's requests for a mistrial or continuance, but stated that if, after cross-examining Wickham, Strauss needed more time to investigate Wickham, the court would take the issue up again.

¶41 Now, on appeal, Strauss argues that the District Court failed to accord her sufficient time to prepare to impeach Wickham's testimony, and that this error was so prejudicial as to deny her the right to a fair trial and due process of law. Strauss acknowledges that she interviewed Wickham three weeks before trial, but contends that the interview was ineffectual since Wickham had not informed anyone about the alleged statement. She maintains that because she had so little time to prepare an impeachment of Wickham, her attempt to challenge Wickham's credibility and reliability during cross-examination was unavailing. Strauss seeks an automatic reversal of her conviction.

¶42 Strauss concedes that the State fully complied with the requirements of the discovery process, and did not commit a *Brady* violation. *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.E.2d 215, 218 (stating that "the suppression by the prosecution of evidence . . . violates due process where the evidence is material either to guilt or to

17

punishment, irrespective of the good faith or bad faith of the prosecution"). However, implicit in Strauss's argument is the notion that the State was obligated to first recognize Wickham's lack of candor and then pressure Wickham to communicate any undisclosed information. Strauss contends that the State was remiss in its handling of Wickham as a potential witness because police officers only questioned her on one occasion. According to Strauss, the result was a "trial by ambush." She insists it was unfair to allow the State to benefit from Wickham's testimony since it failed to make a more substantial effort, before trial, to flesh out Wickham's testimony and make any relevant information available to the defense.

¶43　Strauss's argument is unsupportable, both legally and factually. First, we note that a majority of federal and state jurisdictions, including Montana, have stated that a prosecutor is not required to disclose information about which he has no knowledge. *See, e.g., United States v. Hsieh Hui Mei Chen* (9th Cir. 1985), 754 F.2d 817, 824 (stating that "[w]hile the prosecution must disclose any information within the possession or control of law enforcement personnel . . . it has no duty to volunteer information that it does not possess or of which it is unaware"); *State v. Muir* (1997), 263 Mont. 211, 214, 867 P.2d 1094, 1096 (stating that "[w]hile 46-15-322, MCA, requires the State to provide all pertinent information within its possession or control, 'the statutes have no effect until the State actually develops the knowledge of a specific act, the fact or information that exculpates the defendant'" (citations omitted)).

¶44 In her briefs on appeal, Strauss comments that, unlike the State, she interviewed Wickham extensively before trial, and that Wickham never talked about the alleged statement. Nonetheless, Strauss faults the State for not eliciting from Wickham information which even she failed to educe during her own interview of Wickham. Also, there was no evidence that the State deliberately withheld evidence from Strauss, or engaged in similar wrongdoing. As the District Court noted, "[t]here is nothing in the record at this point that indicates that the State has taken any actions to deliberately withhold this [Wickham's testimony] from the defendant." Thus, Strauss's claim that she was the victim of a "trial by ambush" has no merit.

¶45 Furthermore, the record clearly demonstrates that Strauss was not prejudiced by her lack of time to prepare an impeachment of Wickham. Strauss has offered no evidence to indicate that her defense was prejudiced by Wickham's testimony. In fact, the record demonstrates that Strauss took advantage of the opportunity to achieve an effective impeachment of Wickham during cross-examination on the second day of trial. In an attempt to challenge Wickham's credibility and reliability as a witness, Strauss's attorney questioned Wickham about an unrelated case in which she had lied to police officers on two occasions during their investigation of a car accident involving her husband. Satisfied with this cross-examination, Strauss declined the brief continuance offered by the District Court after Wickham's testimony.

¶46 Since Strauss turned down this additional time to prepare further impeachment of Wickham, and in light of the absence of any indication that Strauss's defense was prejudiced,

19

we conclude that the District Court did not abuse its discretion by allowing Wickham to testify about Strauss's alleged statement or refusing to grant her original request for a two-week continuance.

**Issue Three**

¶47 We next consider Strauss's claim that the District Court erred when it instructed the jury about the scope of an intoxicated person's responsibilities. Our standard of review of a jury instruction in a criminal case is whether the instruction fully and fairly instructed the jury on the law applicable to the case. Since a trial court has broad discretion when instructing a jury, reversible error will occur only if the jury instructions prejudicially affect the defendant's substantial rights. *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, ¶ 15, 61 P.3d 749, ¶ 15.

¶48 The District Court instructed the jury that voluntary intoxication is not a defense to a crime. Instruction Number 15, entitled "Responsibility–Intoxicated Condition," provided the following:

> A person who is in an intoxicated condition is criminally responsible for her conduct, and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the defendant proves that she did not know that it was an intoxicating substance that was consumed or otherwise ingested the substance causing the condition.

¶49 At trial, Strauss contended that the jury instruction (proposed Instruction Number 10) was confusing and prejudicial since she had not claimed intoxication as a defense. According to Strauss, the instruction implied that she was denying culpability on grounds that she was drunk when she shot Brown. Strauss further asserted that the instruction was

20

improper under state constitutional grounds, and cited this Court's ruling in *State v. Egelhoff* (1995), 272 Mont. 114, 125-26, 900 P.2d 260, 266-67 (reversed by *Montana v. Egelhoff* (1996), 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361), in which we stated that a similar instruction, precluding the voluntary intoxication defense, was invalid because it reduced the State's burden of proof as to the mental state element of an offense.

¶50    On appeal, Strauss fails to acknowledge that the United States Supreme Court overruled our decision in *Egelhoff* on federal constitutional grounds. The Supreme Court upheld § 45-2-203, MCA–the statute upon which the intoxication instruction is based–on federal constitutional grounds, and stated that the right to have a jury consider evidence of voluntary intoxication when determining whether the defendant possessed the requisite mental state to support a conviction is not fundamental, and that Montana's statutory prohibition against consideration of such evidence does not violate federal due process. *Egelhoff*, 518 U.S. at 56, 116 S.Ct. at 2024, 135 L.Ed.2d at 376. Because this Court's original opinion in *Egelhoff* did not contain an independent state constitutional analysis, the federal decision is controlling with respect to the validity of the voluntary intoxication jury instruction. Although this Court is not precluded from readdressing *Egelhoff* on independent state constitutional grounds, we have yet to do so. *Byers v. Mahoney* (1996), 279 Mont. 28, 32, 929 P.2d 202, 205.

¶51    In turn, Strauss has not raised a valid state constitutional challenge to the voluntary intoxication jury instruction. In her original objection, Strauss claimed that the instruction infringed upon her due process right to a fair trial under the Montana Constitution. Again,

21

on appeal, Strauss comments that the instruction violated her "state constitutional rights." However, she has yet to offer any authority for this proposition, and altogether declines to argue the point. She contends that the instruction was improper because it might have confused the jury; but this is mere conjecture, and the State and this Court are left to guess what she means. The appellant carries the burden of establishing error by the trial court, and Rule 23(a)(4), M.R.App.P., requires the appellant to cite authority that supports the position being advanced on appeal. *Small v. Good* (1997), 284 Mont. 159, 163, 943 P.2d 1258, 1260; *State v. Carter* (1997), 285 Mont. 449, 461, 948 P.2d 1173, 1180. Because Strauss offers no discernable argument or legal support for her claim that the voluntary intoxication jury instruction violated her state constitutional rights, we decline to further address the issue.

¶52  We conclude that Strauss has not established that Instruction Number 15 prejudicially affected her substantial rights. Accordingly, we hold that the District Court did not commit reversible error when it instructed the jury about the scope of an intoxicated person's responsibilities.

**Issue Four**

¶53  Finally, we consider Strauss's claim that the District Court erred when it sentenced her to an additional ten years imprisonment pursuant to the weapon enhancement statute, § 46-18-221, MCA, the requirements of which were not satisfied by the court. At Strauss's sentencing hearing, the State recommended that she be sentenced to twenty years imprisonment for the negligent homicide conviction, and that she receive an additional ten years for the use of a firearm in the commission of the offense. Strauss recommended a ten-

22

year term of imprisonment, with all time suspended, and objected to the weapon enhancement. The District Court sentenced her to twenty years imprisonment plus ten years for the use of a firearm.

¶54 On appeal, Strauss argues that the weapon enhancement was unlawful because she was not notified of the enhancement before the hearing, and because the jury did not make a separate finding at trial that the enhancing act occurred. She cites § 46-1-401(1), MCA, which provides the following:

> A court may not impose an incarceration penalty enhancement . . . unless (a) the enhancing act, omission, or fact was charged in the information, complaint, or indictment, with a reference to the statute or statutes containing the enhancing act, omission, or fact and the penalty for the enhancing act, omission, or fact; [and] (b) if the case was tried before a jury, the jury unanimously found in a separate finding that the enhancing act, omission, or fact occurred beyond a reasonable doubt . . . .

¶55 This section sets forth the general requirements for imposing a penalty enhancement. In turn, these requirements are made applicable to weapon enhancements through § 46-18-221, MCA, entitled, "Additional sentence for offenses committed with dangerous weapon." The Montana Legislature made the provisions of § 46-1-401(1), MCA, effective on May 1, 2001. Strauss killed Brown on May 5, 2001. Because § 46-1-401(1), MCA, was effective when Strauss committed her crime, the District Court was required to comply with the statute in determining Strauss's sentence. On appeal, the State concedes that the court violated the statute by imposing the ten-year weapon enhancement. The State notes that the enhancement was not charged in the Information with a specific reference to the weapon enhancement statute and that the jury did not find separately that the enhancing act occurred.

23

¶55   In light of the State's concession, we conclude that the District Court erred by sentencing Strauss to an additional ten years under the weapon enhancement statute, § 46-18-221, MCA, without first complying with the procedural requirements of § 46-1-401(1), MCA.

## CONCLUSION

¶57   For the foregoing reasons, we affirm the judgment of the District Court and strike the weapon enhancement portion of Strauss's sentence.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER