

DA 13-0184

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 224

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

ROBERT ZLAHN,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 11-0468
Honorable Mary Jane Knisely, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

            Wade Zolynski, Chief Appellate Defender; Koan Mercer, Assistant Appellate
Defender; Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General; Pamela P. Collins, Assistant
Attorney General; Helena, Montana

            Scott Twito, Yellowstone County Attorney; Rod Souza, Deputy County
Attorney; Juli Pierce, Deputy County Attorney; Billings, Montana


Submitted on Briefs:  June 25, 2014
Decided:  August 19, 2014

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1      Robert Zlahn (Zlahn) appeals from the judgment of the Montana Thirteenth Judicial District Court, Yellowstone County, sentencing him to the Department of Corrections for a total of thirty years after a jury convicted him of three felonies:  Assault with a weapon, criminal endangerment, and tampering with or fabricating physical evidence.  We affirm.

## ISSUES

¶2      We review the following issues:

*1.  Should we exercise plain error review to consider Zlahn's contention that the failure to immediately assign him counsel violated his constitutional and statutory rights?*

*2.  Did the District Court err in refusing Zlahn's proposed jury instructions regarding factors affecting the reliability of eyewitness identification?*

*3.  Did the District Court err in its evidentiary rulings related to condoms found in Zlahn's van, gunshot residue tests, line-up statistics and vantage point evidence?*

*4. Did the District Court abuse its discretion when it refused to declare a mistrial based on the court's comments to a co-conspirator?*

*5.  Is there sufficient cumulative error to warrant a new trial?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      On July 1, 2011, Alanna Vincent (Vincent) was returning to her home in the Billings Heights after doing some grocery shopping at the nearby Walmart.  She noticed two black men in a dented maroon van make a U-turn to follow her vehicle.  She parked her vehicle in

front of her home and watched as the van drove by slowly. As she was getting out of her car, the van turned around to pull up beside her. Through the open window, the driver, a short-haired black man with a gap in his teeth, asked her whether she wanted to get in the van and have intercourse. She noticed that he had an accent. Feeling threatened, Vincent told the men to leave her alone and ran into her home. There, she told her boyfriend, a body builder and former football player, Ryan Grosulak (Grosulak), what had happened.

¶4 Grosulak began driving around the neighborhood in search of the dented maroon van with two black men in the front seats. He caught up with a vehicle that matched that description not far away. He rolled down the window of his car, yelled at the men about their behavior towards Vincent using some choice language, and made an obscene gesture. A "skinny white kid" jumped out of the back and wanted to fight. Then the driver stepped out of the car and began returning Grosulak's obscenities. Grosulak stepped out of the car. When he did so, "just bullets just start flying, like I just got totally stunned." He said the van's driver, who had short or buzzed hair and was wearing a bright green shirt, was the shooter, although he did not see the gun. He later testified that the gun was a silver pistol. Terrified, Grosulak dove back into his car and began both driving away and calling 9-1-1. While he was on the phone with the 9-1-1 dispatcher, he returned to the apartment.

¶5 Officer Joseph Dickerson (Officer Dickerson) was employed with the Billings Police Department at the time as a patrol officer. At about 2:57 p.m. he received a dispatch for shots fired in the Heights and arrived at a nearby residential address where another officer believed he had apprehended the suspects. The suspects were Zlahn, a black man who had

3

short hair and was wearing a green shirt; Samuel Bettie (Bettie), a black man who had dreadlocks at the time; and Sean Bowers (Bowers), a young white man. The address belonged to Bowers's grandmother.

¶6     Officer Dickerson spoke with Zlahn at the scene. Officer Dickerson noticed that Zlahn had an accent. Zlahn said he had dropped his girlfriend off at work, then his vehicle had broken down and he had found someone to push his vehicle from where it had broken down several miles away to its current location. He denied involvement with the shooting.

¶7     Officers also spoke with Bowers at the scene. Bowers initially denied being in the van and said he had just met Bettie and Zlahn on the street. He also said that he was going to meet his mother at Walmart. He later changed his story and admitted to being present for the altercation. He said he heard three shots fired, but did not know who had fired them. He said the shots came from the driver's side of the vehicle. When officers asked Bowers where the weapon was, he pointed to a bush. There the officers recovered a gun. The gun was a .45 caliber that was ready to fire. Officer Dickerson bagged and inventoried the weapon.

¶8     The police transported Zlahn, Bettie and Bowers to the City Hall where a detective administered gunshot residue (GSR) tests to all three men. Zlahn became agitated when the detective said he would be doing GSR testing, while the other two men remained calmer. The GSR tests revealed that all three suspects had been in close proximity to the gun when it was fired; however, it did not show which of the suspects had fired the gun. Comparisons of DNA found on the gun with the suspects' DNA showed that Zlahn's DNA was a "major contributor" to the DNA profile, but that Bettie's was not. The expert who testified said that

4

the DNA profile from the gun was a "mixed" profile with probably three to four contributors. She explained that the fact that Bettie's DNA did not appear on the gun did not mean that Bettie could not have handled the gun or been the shooter. It appears there was no comparison of Bowers's DNA with the DNA found on the gun.

¶9 Later on July 1, 2011, an officer arrived at Vincent's and Grosulak's apartment to transport them to the place where the van had been apprehended. Vincent and Grosulak both were sure the van in which the suspects were apprehended was the one they had seen. A detective arrived afterwards to show them photographic line-ups. Grosulak could not identify the shooter from any line-up because he said events had happened too quickly for him to be able to identify anyone. Vincent identified Zlahn as the person who had been driving the van when the offensive remarks were made. Following Zlahn's arrest, the keys to the van were found among Zlahn's belongings. The van was registered to Zlahn's girlfriend.

¶10 Zlahn was charged with felony attempted deliberate homicide in Yellowstone County Justice Court. Zlahn appeared before a justice of the peace on July 5, 2011, and, through a public defender who had come to court to represent all defendants on the jail-court calendar that day, requested to be represented by a public defender. The justice of the peace ordered the Office of the State Public Defender (OPD) to represent Zlahn and ordered the State to file an information in district court by July 12, 2011. Pursuant to an internal policy not to assign attorneys to felony defendants until after the defendants have been arraigned in district court, OPD did not assign a public defender to Zlahn immediately. The State did not file its

5

information until July 21, 2011. Zlahn was arraigned in District Court on July 25, 2011. At his arraignment he was represented by another on-duty public defender, who spoke with him for approximately two minutes before court. The District Court ordered OPD to represent Zlahn. However, no public defender was assigned to represent Zlahn until August 11 or 12, 2011—approximately five weeks after he first appeared in court related to the felony charges against him and three weeks after he was arraigned. As a result, Zlahn did not have representation during the ten-day window in which he could have been advised of, and exercised, his right to substitute the judge. On April 20, 2012, the State amended its information to add, as an alternative to attempted deliberate homicide, counts of assault with a weapon, criminal endangerment and witness tampering. A jury trial was held from July 16-24, 2012.

¶11 At trial, eyewitnesses testified as to the shooter's identity. Bowers testified that Zlahn was the shooter. Two eyewitnesses testified that the driver of the van was the shooter. Zlahn sought jury instructions on factors that affect reliability of eyewitness identifications, such as difficulties with cross-racial identification. The District Court refused those instructions. Over Zlahn's counsel's objections, the District Court also permitted admission of evidence regarding a stockpile of condoms found in the suspect van; an officer's testimony about what criminals think about the strength of GSR testing; an officer's account of how often other witnesses, in other cases, have picked people out of photo line-ups; and an officer's video and testimonial evidence as to the eyewitnesses' vantage points. Zlahn's

6

counsel sought and was denied a mistrial following a comment by the District Court that he believed reflected on Bowers's credibility.

¶12 The jury found Zlahn not guilty of attempted deliberate homicide, but found him guilty of assault with a weapon, criminal endangerment and witness tampering. The District Court sentenced Zlahn to a total of thirty years in Montana State Prison with five suspended.

## STANDARD OF REVIEW

¶13 This Court reviews questions of statutory construction and alleged violations of the constitutional right to counsel de novo. *See State v. Gatlin*, 2009 MT 348, ¶ 16, 353 Mont. 163, 219 P.3d 874; *Hammer v. State*, 2008 MT 342, ¶ 9, 346 Mont. 279, 194 P.3d 699.

¶14 We review jury instructions in a criminal case to determine whether the district court abused its discretion. *State v. Schaeffer*, 2014 MT 47, ¶ 12, 374 Mont. 93, 321 P.3d 809. A district court has broad discretion when it instructs a jury, and reversible error occurs only where the instructions prejudicially affect the defendant's substantial rights. *Schaeffer*, ¶ 12.

¶15 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Hardman*, 2012 MT 70, ¶ 8, 364 Mont. 361, 276 P.3d 839. To the extent an evidentiary ruling is based on interpretation of an evidentiary rule or statute, however, the review is de novo. *Hardman*, ¶ 8.

¶16 A district court's decision on a motion for a mistrial must be based upon whether the party has been denied a fair and impartial trial, and the decision on the motion is reviewed to determine whether the court abused its discretion. *Heidt v. Argani*, 2009 MT 267, ¶ 10, 352 Mont. 86, 214 P.3d 1255.

**DISCUSSION**

¶17 *1. Should we exercise plain error review to consider Zlahn's contention that the failure to immediately assign him counsel violated his constitutional and statutory rights?*

¶18 The Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution, guarantee a criminal defendant the right to assistance of legal counsel. U.S. Const. amend. VI; Mont. Const. art. II, § 24. The right to counsel arises at every critical stage of criminal proceedings. *Ranta v. State*, 1998 MT 95, ¶ 17, 288 Mont. 391, 958 P.2d 670. We have defined a "critical stage" as any step of the proceeding where there is potential for substantial prejudice to the defendant. *Ranta*, ¶ 17. Section 47-1-104(3), MCA, provides: "When a court orders the office [of the public defender] or the office of appellate defender to assign counsel, the appropriate office shall immediately assign a public defender qualified to provide the required services."

> We generally do not review on appeal issues that were not raised before the district court. However, we may undertake review of such an issue under the plain error doctrine in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process.

*State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799 (quoting *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091). We exercise our discretion to invoke plain error review sparingly, on a case-by-case basis. *McDonald*, ¶ 8.

¶19 Zlahn argues on appeal that OPD's failure to appoint counsel for five weeks violated § 47-1-104(3), MCA, as well as Zlahn's constitutional rights to counsel, so tainting the

8

fundamental fairness of the proceedings as to require we vacate Zlahn's conviction. Alternatively, he argues that the period during which Zlahn could have exercised his option to substitute the district court judge was a critical stage in the proceedings and, because Zlahn did not have counsel during that period, we must reverse his conviction. Although Zlahn did not present these issues to the District Court, he argues we should review them because he was an indigent defendant facing felony charges and failing to review his claims related to the five-week delay in appointment of counsel would "compromise the integrity of the judicial process."

¶20     Plain error review is not warranted here. Although OPD did not appoint a specific counsel for Zlahn until five weeks into the proceedings, he had counsel for both his initial court appearances. The first "failure" to appoint Zlahn his own public defender occurred pursuant to a court policy. Once Zlahn had been arraigned and became eligible for a public defender under the policy, OPD assigned him counsel within two to three weeks. He had counsel at each of his court appearances. Although Zlahn would argue that the time lapse between his initial appearance in District Court and appointment of counsel was excessive because it denied him the option of substituting the judge, we have never held that the ten-day window in which substitution of the judge may occur is a critical stage of the proceedings. Nor is there any indication that Zlahn actually wanted to substitute the judge. Zlahn did not write letters or "kites" complaining about the judge. Once counsel had been assigned, Zlahn never objected to the judge or to OPD's failure to assign counsel so he could substitute the judge. OPD could certainly have moved more swiftly to provide Zlahn with

9

counsel, but its failure to do so did not give rise to a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. We decline to exercise plain error review.

¶21     *2. Did the District Court err in refusing Zlahn's proposed jury instructions regarding factors affecting the reliability of eyewitness identification?*

¶22     We review jury instructions to determine whether, taken as a whole, they fully and fairly instruct the jury on the applicable law. *State v. Norman*, 2010 MT 253, ¶ 13, 358 Mont. 252, 244 P.3d 737. In *State v. Hall*, 244 Mont. 161, 171-72, 797 P.2d 183, 190 (1990), this Court upheld a district court's refusal to give a jury instruction on eyewitness identification where the substance of the proposed instruction was adequately covered by the general witness credibility instructions and more than one eyewitness had identified the alleged offender. Zlahn urges us to reconsider *Hall* in light of empirical research regarding the risks and prevalence of false identifications and to join the "developing trend" of offering eyewitness identification instructions. In response, the State offers that this is not a pure eyewitness identification case because several eyewitnesses provided descriptions that implicated Zlahn, but the person who actually identified him was his friend, Bowers.

¶23     We cannot say that, where *Hall* is the applicable law, the District Court erred in refusing Zlahn's proposed jury instructions. There is no requirement that a jury be instructed specifically on eyewitness identifications in Montana. Here, just as in *Hall*, the substance of Zlahn's proposed jury instructions was covered by the other instructions and Zlahn's conviction hinged upon the testimony of more than one witness. The instructions properly

10

instructed the jury on witness credibility: Jury instruction four directed jurors to weigh witness testimony in light of witnesses' appearance on the stand, manner of testifying, apparent candor, apparent fairness and knowledge or means of knowledge, among other factors. The instructions also provided definitions of direct and circumstantial evidence and explained that the State was required to prove beyond a reasonable doubt the identity of the person who committed the crime. These instructions, taken as a whole, fully and fairly instructed the jury on the applicable law.

¶24    Further, the State is correct that this is not a pure eyewitness identification case—no eyewitness, except for Bowers, specifically identified Zlahn as the shooter. Zlahn's conviction hinged on cumulative circumstantial evidence derived from eyewitness testimony that was subject to cross-examination. Even applying *Hall*, more than one eyewitness identified Zlahn as the van's driver or the shooter. The shooting was committed in public, in broad daylight, on a busy street. Bowers, who knew Zlahn, testified under oath that he saw Zlahn shoot the gun. Vincent identified Zlahn as the van's driver in a line-up. Witnesses Michelle Wellard and Richard Morris said the driver of the van was the shooter. Bowers also testified to that fact. Grosulak told the police that the shooter was wearing a green shirt and Zlahn was wearing a green shirt when he was apprehended. Zlahn was uncooperative with the GSR testing. The key to open the van's door and start its ignition was found in Zlahn's property when he was arrested shortly after the shooting and the van belonged to Zlahn's girlfriend. Zlahn was included as a probable contributor to the DNA found on the gun while Bettie most likely was not. Since not only eyewitness identifications, but also an

11

array of circumstantial evidence, pointed to Zlahn as the shooter, no jury instruction on eyewitness identifications was necessary under *Hall*.

¶25 The jury instructions on eyewitness identifications were not warranted and the court did not abuse its discretion by failing to give such an instruction.

¶26 *3. Did the District Court err in its evidentiary rulings related to condoms found in Zlahn's van, gunshot residue tests, line-up statistics and vantage point evidence?*

**a. Condoms found in Zlahn's van.**

¶27 Although trial courts have broad discretion in determining the relevance and admissibility of evidence, they remain bound by the Montana Rules of Evidence. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. M. R. Evid. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

¶28 Over Zlahn's objection, the District Court admitted evidence of a large number of condoms found in the maroon van. The State's theory was that the condoms were relevant to Vincent's credibility because Vincent alleged Zlahn had made sexual comments to her and the presence of the condoms in the van tended to show Zlahn's interest in sexual relations with women other than his girlfriend. On appeal, Zlahn argues that "[t]he presence of prophylactics in a vehicle has no legitimate tendency to prove that the vehicle's driver made boorish sexual comments to a pedestrian." We agree. We can see no relationship between the presence of condoms in the van and the alleged inappropriate comments. Nor do we see

any relationship between the presence of condoms in the van and the crime charged. Further, the presence of a large stockpile of condoms could certainly have colored the jury's view of Zlahn by implying he was promiscuous or unfaithful to his girlfriend. We conclude this evidence was more prejudicial than probative and the District Court abused its discretion by admitting it.

¶29 Since we have determined that the District Court committed error, we next consider whether this error requires reversing Zlahn's conviction. The first step in this analysis is to determine whether the error was structural error or trial error. *State v. Garding*, 2013 MT 355, ¶ 28, 373 Mont. 16, 315 P.3d 912. Structural error affects the framework in which the trial proceeds, and so taints the fundamental fairness of the proceedings as to require automatic reversal. *Garding*, ¶ 28. Examples include errors in jury selection, deprivation of counsel, and lack of an impartial trial judge. *Garding*, ¶ 28. Trial error, conversely, typically occurs during presentation of a case to the jury. *Garding*, ¶ 28. It can be reviewed qualitatively for prejudice in context of other evidence introduced during trial and, therefore, is susceptible to harmless error analysis. *Garding*, ¶ 28.

¶30 Here, admission of the condom evidence occurred during presentation of the case to the jury. The error in admission is trial error and we consider whether the error was harmless.

¶31 We have explained that once a convicted person establishes that evidence was erroneously admitted and has alleged prejudice, it becomes incumbent upon the State to demonstrate that the error was not prejudicial. *State v. Van Kirk*, 2001 MT 184, ¶ 42, 306

Mont. 215, 32 P.3d 735. Section 46-20-701(1), MCA, Montana's criminal harmless error statute provides:

> (1) Whenever the record on appeal contains any order, ruling, or proceeding of the trial court against the convicted person *affecting the convicted person's substantial rights* on the appeal of the cause, together with any required objection of the convicted person, the supreme court on that appeal shall consider the orders, rulings, or proceedings and the objections thereto and shall reverse or affirm the cause on the appeal *according to the substantial rights of the respective parties*, as shown upon the record. A cause may not be reversed by reason of any error committed by the trial court against the convicted person *unless the record shows that the error was prejudicial*.

(Emphasis added). We have held that where erroneously admitted evidence is cumulative in nature, it is not prejudicial, and the resulting error is harmless. *State v. Hansen*, 1999 MT 253, ¶ 95, 296 Mont. 282, 989 P.2d 338. In making its proof under the "cumulative evidence" standard, the State must direct us to admissible evidence that proved the same facts as the tainted evidence. *Van Kirk*, ¶ 44.

¶32   We conclude that here, the State has borne its burden of directing our attention to admissible evidence that proved the same facts as the inadmissible condom evidence. As the State pointed out, Vincent testified that Zlahn had made a lewd proposition to her from his vehicle; thus, the jury had before it clearly admissible evidence that Zlahn was willing to engage in promiscuous conduct. While the admission of the condom evidence may have reinforced this impression, it did not unfairly create an unfounded inference. In light of Vincent's testimony, the condom evidence was cumulative. *See Van Kirk*, ¶ 44. Accordingly, it did not prejudice Zlahn, or otherwise affect his substantial rights. *See In re R.M.B.*, 213 Mont. 29, 33-34, 689 P.2d 281, 283 (1984); *Hansen*, ¶¶ 86-95. Although the

14

condom evidence was improperly admitted because it was more prejudicial than probative, its admission did not cause such prejudice to Zlahn as to warrant a new trial.

**b. Gunshot residue tests.**

¶33 A lay witness may testify as to opinions and inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. M. R. Evid. 701. This Court has condoned police officer testimony on matters as to which they have extensive experience and are properly qualified through training and experience. *State v. Dewitz*, 2009 MT 202, ¶ 40, 351 Mont. 182, 212 P.3d 1040. For instance, we have upheld a trial court's admission of officer testimony regarding the cause of an accident, based on the officer's experience in accident investigation. *Hislop v. Cady*, 261 Mont. 243, 249, 862 P.2d 388, 392 (1993). We have also upheld admission of officers' testimony as to whether a criminal defendant possessed drugs with an intent to sell, based on their training and experience as to the methods used in the illicit drug trade. *State v. Frasure*, 2004 MT 305, ¶ 18, 323 Mont. 479, 100 P.3d 1013. Hearsay testimony, however, is generally not admissible. M. R. Evid. 802. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). M. R. Evid. 703 provides that an expert witness may rely on hearsay evidence in formulating an expert opinion.

¶34 At trial, Zlahn objected to testimony elicited from an officer about what people involved with criminal activity think about GSR testing. He contended that the officer's

testimony was inadmissible because it was based on conversations he had had with people to whom he had administered GSR testing during his fourteen years as a detective. Because the officer's opinion was based on hearsay, he argued, it was inadmissible. The District Court allowed the testimony over Zlahn's objection. The officer testified that, in his experience, people on the street believed that if GSR was found on their hands, they were caught. He also testified that Zlahn was resistant to GSR testing and was generally unruly when he learned the testing would be performed. On appeal, Zlahn argues that the District Court erred by allowing the officer's testimony about criminals' impressions of GSR testing because it incorporated inadmissible hearsay. He further contends that the District Court erred because in allowing the testimony it eroded the distinction between M. R. Evid. 701 and M. R. Evid. 703.

¶35   We conclude that the officer's testimony was properly admitted because he had extensive experience dealing with criminals and administering GSR testing, and was testifying about inferences he drew based on his experience. The officer testified he had worked as a detective for fourteen years over the course of which he conservatively estimated he had administered fifty GSR tests. He testified that he had twenty years of experience, including four in the drug unit, in which he observed that people talked on the street. Based on his experience, he opined that criminally involved individuals believed that GSR testing could be conclusively used to incriminate them. The officer did not testify as to specific statements that criminal defendants made, or even to their overall demeanor. Instead, he testified generally about his own impressions based upon his experience. He also

16

testified that Zlahn was resistant to GSR testing—tending to show that Zlahn believed that the testing might incriminate him. Such an opinion is no different from an opinion from an officer trained in accident investigation as to the cause of an accident, or officers' evaluation of whether a criminal defendant possessed drugs with intent to sell. It was properly admitted pursuant to M. R. Evid. 701.

¶36 We reject the notion that allowing such testimony erodes the distinction between M. R. Evid. 701 and 703. The officer's testimony was clearly lay opinion testimony, admissible under M. R. Evid. 701. In *Frasure*, ¶ 17, we observed: "Lay opinion testimony is admissible if 'the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" (Quoting M. R. Evid. 701). We noted that we had previously applied M. R. Evid. 701 to the testimony of police officers as to matters in which they had extensive experience and training. *Frasure*, ¶ 17. We said that because the testimony offered by the police officers was rationally based on their perceptions and helped give a clear understanding of the defendant's intent, the court did not err in admitting the testimony. *Frasure*, ¶ 18. The same logic applies here. The officer's testimony was properly admitted pursuant to M. R. Evid. 701 and was not admitted under M. R. Evid. 703; thus, there is no danger of eroding the distinction between the two rules.

c. **Line-up statistics.**

17

¶37    "Evidence which is not relevant is not admissible." M. R. Evid. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence . . . [and] may include evidence bearing upon the credibility of a witness or hearsay declarant." M. R. Evid. 401.

¶38    Zlahn challenges the District Court's decision to allow the detective who administered the photo array to Vincent to testify that it was very rare for witnesses to identify suspects from photo line-ups. He argues that this testimony was irrelevant because "[h]ow often other witnesses looking at other photo lineups in other cases involving other suspects and circumstances picked someone out for the detective has no tendency to make it more probable that Ms. Vincent's identification of Mr. Zlahn was accurate." As the State points out, however, the defense presented evidence aimed at attacking Vincent's credibility in identifying Zlahn. We conclude that the officer's testimony was relevant because it bears upon the credibility of Vincent's identification of Zlahn as the van's driver. The District Court did not abuse its discretion by allowing this testimony.

### d. Vantage point evidence.

¶39    Zlahn next argues that the District Court erred by admitting photos and videos created by a police detective purporting to reproduce the viewpoints of various witnesses. He claims these photos and videos were inadmissible because they were derived from hearsay and cites *State v. Strauss*, 2003 MT 195, ¶ 34, 317 Mont. 1, 74 P.3d 1052, to support his view that the testimony of a witness who was present for the shooting and who could attest to the accuracy

18

of the representations was necessary to lay foundation for the proper admission of these representations.   In *Strauss*, we held that a videotape of a crime scene was admissible, but should not have been played with an officer's recorded commentary because the recording deprived the defense of the opportunity to challenge objectionable statements as they were made. *Strauss*, ¶¶ 22-24.  We held that a second videotape created by the prosecution was inadmissible because it constituted a re-enactment that duplicated the first videotape and lacked proper foundation, in the form of testimony by a witness who was present at the crime and could attest to its accuracy. *Strauss*, ¶ 32.

¶40     *Strauss* does not support Zlahn's view that the photos and videos at issue here were inadmissible.  The videos at issue were not re-enactments, like the second *Strauss* video, but existed primarily to document physical distances and vantage points.  We held in *Strauss* that the first video was admissible for that purpose, so long as it was played without the detective's recorded commentary. *Strauss*, ¶ 22.  Here, as we recommended in *Strauss*, the detective testified about what was being shown in the video while the video was playing.  Zlahn cross examined the detective about the evidence.  Some of the witnesses went to the scene with the detective to show him where they had been located.   All the witnesses, upon whose statements the videos and photos were based, were present and available for cross examination.  The witnesses testified at trial about where they were located when they made their observations.  The combined effect of these facts, along with the limited purpose for which the evidence was admitted and used, gives the detective's photos and videos the

necessary "circumstantial guarantees of trustworthiness" to overcome the ban on hearsay, to the extent that ban is implicated here.  M. R. Evid. 803(24).

¶41     *4. Did the District Court abuse its discretion when it refused to declare a mistrial based on the court's comments to a co-conspirator?*

¶42     Zlahn alleges that the District Court improperly commented on Bowers's credibility when it made the following statement, in the presence of the jury:  "Mr. Bowers, I know you're trying to do your best today because you've mentioned you're under oath and you're trying to tell the truth and adhere to the subpoena that was issued, but the way the process works is Mr. Abbott asks the questions."  Following that comment, out of the presence of the jury, Zlahn objected to the comment and moved for a mistrial.  The court denied Zlahn's motion.  Although we noted in *Sloan v. State*, 236 Mont. 100, 105, 768 P.2d 1365, 1369 (1989), that "a court should refrain from comments on witness credibility," here, as in that case, the District Court's statement, taken in context, was not a comment on witness credibility.  Bowers stated at the beginning of his testimony that he was reluctant to testify and was appearing because of the subpoena; the court's comment is properly understood as an instruction to a witness, not a comment on his credibility.  The District Court did not err in making this comment, or abuse its discretion by denying Zlahn's motion for a mistrial.

¶43     *5. Is there sufficient cumulative error to warrant a new trial?*

¶44     Zlahn argues that the District Court committed so many errors that it deprived him of the due process guaranteed by the Fourteenth Amendment of the United States Constitution.  Although we recognized in *Kills on Top v. State*, 279 Mont. 384, 392, 928 P.2d 182, 187

20

(1996), that cumulative error might serve as a basis for reversal even where individual errors do not, that recognition is inapposite here. The District Court committed only a single, harmless error, by admitting the evidence of condoms found in the van. There is no cumulative error.

## CONCLUSION

¶45     Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE