No. 01-908

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 76

STATE OF MONTANA,

Plaintiff and Respondent,

v.

LENORSE SLAVIN,

Defendant and Appellant.

APPEAL FROM:     District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 01-68 & DC 01-26,
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kristina Guest, Appellate Defender's Office, Helena, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; John Paulson, Assistant
Attorney General, Helena, Montana

Martin D. Lambert, County Attorney; Ashley Harrington, Deputy
County Attorney, Bozeman, Montana

Submitted on Briefs:   February 27, 2003

Decided:   March 30, 2004

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Lenorse Slavin (Slavin) was charged by Information with kidnaping, a felony, in violation of § 45-5-302, MCA, and assault with a weapon, a felony, in violation of § 45-4-213(1)(b), MCA. A jury in the Eighteenth Judicial District Court, Gallatin County, found Slavin guilty of kidnaping and the lessor offense of misdemeanor assault, and he appeals from the judgment entered therein. We affirm.

¶2 Slavin presents the following issues on appeal:

¶3 1. Whether the District Court properly quashed the defendant's subpoenas for the newspaper reporter and editor to appear and testify at trial.

¶4 2. Whether the District Court abused its discretion in limiting the testimony of the defendant's expert witness.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Slavin was a caregiver for Marion Merryfield (Merryfield). Merryfield suffers from several medical conditions, including Alpha 1 Antitrypsin Deficiency, which is a lung condition, and Left and Right Complex Temporal Lobe Epilepsy, also commonly known as complex seizures. During a seizure, Merryfield can appear awake, conscious, and under control, but not be aware of what is going on around her. She may also run, flail and injure herself, and may also be aggressive if restrained. Merryfield's condition requires her to be on oxygen and various medications, including Prednisone, which can cause Merryfield to act irrationally.

2

¶6     Due to her condition, Merryfield usually employs a caregiver.  In October of 1999, Merryfield employed Slavin as her live-in caregiver.  Thereafter, an intimate relationship developed between them.

¶7     On the night of January 18, 2001, Merryfield and Slavin were drinking at Merryfield's residence.  Sometime after midnight, Merryfield called police and reported that Slavin had thrown her against a bookcase.  When Gallatin County Deputy Sheriff Paul Lewis (Lewis) arrived,  he questioned Slavin about the reported incident and also about a 9mm gun that Slavin owned.  Slavin showed Lewis the gun, which was located in a case under the foot of Slavin's bed.  Lewis permitted Slavin to keep the gun.  Lewis testified that, after speaking with Merryfield and Slavin, he could not "articulate that a crime had occurred at the residence," so he decided to give Slavin a ride to a local motel in order to separate the parties.  In so doing, Lewis told Slavin not to return to the house until everybody was sober and calm.

¶8     After Lewis left him at the motel, Slavin called Merryfield and told her to come and get him, but Merryfield reported Slavin's call to police.  Lewis then called Slavin.  Slavin informed Lewis that Slavin had asked a friend to take him to the friend's home.  Lewis replied that was fine, but advised Slavin not to return home.  However, a few hours later, Slavin did so, and upon his arrival at Merryfield's home, he retrieved his gun, threw the gun case at Merryfield's feet, chambered a bullet in the gun, told Merryfield he was going to kill her, and confined her to the house.  While Slavin was using the bathroom, Merryfield tried to get away, but Slavin caught her outside and drug her by the hair back into the home and

3

into the bedroom, where he again threatened her with the gun. Slavin kept the gun on her for approximately four hours but eventually he fell asleep on the floor near the front of Merryfield's bed. Merryfield testified that if she had wanted to leave the room she "would have had to have gone around him to get to the door to get out."

¶9 The following day Merryfield went to the hospital to attend a previously scheduled doctor appointment. She told a nurse, Jane Jacobsen (Jacobsen), and a doctor, Timothy James Adams, M.D. (Dr. Adams) what had occurred between her and Slavin. Dr. Adams, Merryfield's physician for an emphysema condition, treated Merryfield for injuries to her face and chest. Dr. Adams entreated Merryfield to call the police, but she was fearful that Slavin would retaliate by killing her cat. After Merryfield agreed, Dr. Adams had Jacobsen call the police. Deputy Sheriff Dan Springer (Springer) responded to the call and interviewed Merryfield regarding the incident.

¶10 Slavin was arrested and charged by Information with kidnaping and assault with a weapon. He was subsequently released on bail after Merryfield contacted a bail bondsman, Ben Thielen (Thielen), to arrange for Slavin's release. Merryfield told Thielen that she wanted Slavin to come back home because she needed him, and that on the night of January 18-19, 2001, she had suffered an "episode." After his release, Slavin, with Merryfield, went to see Slavin's attorney, Ed Guza (Guza). Merryfield told Guza that the incident with Slavin did not happen. Merryfield also told her subsequent caregiver, Jeff Michael Ohannesian (Ohannesian), that she was drunk on the night of January 18-19, 2001, that she had wanted to go outside of her home because she had felt hot and confined, and that she did not

4

remember if anyone was in the trailer. Further, Merryfield called Springer and told him that the incident with Slavin did not happen and that she had "made it all up." Then, when Slavin was arrested and placed in jail again following a subsequent assault on Merryfield, Merryfield re-contacted Springer and told him that she was going back to her original story because Slavin was in jail.

¶11 Merryfield also spoke with Kathleen O'Toole (O'Toole), a reporter with the *Bozeman Daily Chronicle* (*Chronicle*), and Ray Ring (Ring), the *Chronicle's* editor, about the incident. An article was published in the *Chronicle's* February 16, 2001, edition, wherein Merryfield was quoted as saying that she could not in "good conscience" say the incident with Slavin occurred "the way the police describe it" and that because of her conditions, she needs to be restrained sometimes. After the story ran, Guza met with O'Toole and Ring regarding their interview with Merryfield, and he had subpoenas issued for them on June 19, 2001, to appear at trial. O'Toole and Ring moved to quash the subpoenas on July 6, and the District Court, referencing § 26-1-903, MCA, quashed the subpoenas on July 9, the day before trial.

¶12 Slavin also filed a motion in limine which sought leave for Slavin's expert, Dr. Paul Bach (Dr. Bach), to testify regarding certain instances of Merryfield's past conduct in support of Slavin's theory that Merryfield, on the night in question, had suffered a seizure in which Slavin had been trying to restrain her. These instances included Merryfield's accosting of a Great Falls police officer who was investigating a car accident, and her subsequent memory lapse regarding the incident; her threat to shoot a neighbor, viewed as

5

an incident of disorderly conduct, and her later inability to remember the incident; her initiation of criminal charges against another individual whom she claimed had shot a telephone out of her hand and her later acknowledgment that she had misrepresented facts to police; her arrest for driving 91mph in a 65-mph zone and the State's subsequent dismissal of the charges due to her medical conditions; Merryfield's previous allegation that Slavin had assaulted her, her oral and written retraction of the assault report, and later acknowledgment that her retraction had not been truthful; and two DUI charges that Merryfield had pending against her at the time of trial herein. The District Court ruled that Slavin could inquire into the incident involving Merryfield's claim that a telephone had been shot out of her hand, and about her previous assault allegation against Slavin, including the untruthful statements Merryfield had given in those incidents. However, Slavin was prohibited from inquiring about the assault on the peace officer, the disorderly conduct incident, the speeding ticket, and two pending DUIs.

¶13 The District Court also permitted Dr. Bach to testify that he had reviewed Merryfield's file and had based his opinions on other incidents in which she may have acted in accordance with his conclusion about the effects of the seizure disorder and her medication, but that he could not "get into the specific nature of that prior conduct." The court allowed Dr. Bach to testify generally as to the nature and symptomatology of Merryfield's disorder and the side effects associated with her medications, combined with alcohol.

¶14 Following trial, the jury convicted Slavin of kidnaping but acquitted him of the offense of assault with a weapon and convicted him instead of misdemeanor assault. Slavin appeals the District Court's decision to quash the subpoenas for O'Toole and Ring and the District Court's limitation of Dr. Bach's testimony.

## DISCUSSION

### ISSUE ONE

¶15 *Did the District Court properly quash the defendant's subpoenas for the newspaper reporter and editor to appear and testify at trial?*

¶16 The District Court quashed Slavin's subpoenas for O'Toole and Ring to appear and testify pursuant to § 26-1-901 et. seq., MCA, the Media Confidentiality Act, commonly known as the reporter shield statute. Slavin argues that the Sixth Amendment and the Montana Constitution guarantee him the right to compel the attendance of witnesses on his behalf and that these constitutional rights should prevail over the reporter's shield statute. He asserts that O'Toole and Ring's testimony was necessary because Merryfield's credibility was at issue, and they could have offered testimony regarding Merryfield's demeanor during the interviews, how the interviews originated, and the specific recantations Merryfield made in the interviews.

¶17 The State argues, first, that Slavin's constitutional argument against assertion of the reporter privilege was not preserved for appeal. The State also argues that § 26-1-902, MCA, provides a privilege against compelling O'Toole and Ring to testify and that, even if O'Toole and Ring's testimony should have been allowed, any error in excluding it was harmless.

7

¶18    Subpoenas for O'Toole and Ring to testify were issued three weeks before trial, but it was not until the Friday before trial that O'Toole and Ring moved to quash the subpoenas. The parties submitted briefs, which they had a half day to prepare, and thereafter the District Court conducted a hearing and quashed the subpoenas on the basis of § 26-1-901 et seq., MCA. While Slavin did not make any constitutional arguments in his brief, he did raise the constitutional issue during the hearing. Although the State asserts that Slavin's constitutional issue was not properly raised because O'Toole and Ring did not respond to this argument during the hearing, and the District Court did not address the issue, the limited opportunity Slavin had to prepare for the hearing, and his raising of the issue orally, mitigate against the State's position. We hold that Slavin properly preserved the issue for appeal.

¶19    However, we agree with the State that, even if we would conclude that O'Toole and Ring's testimony was improperly excluded under § 26-1-902, MCA, any error was harmless under our analysis adopted in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.

¶20    Generally, a trial error is one that occurs during the presentation of a case to the jury and a structural error is typically one of constitutional dimensions that precedes the trial. *Van Kirk*, ¶¶ 38, 40. While any error here technically occurred before the trial, we conclude that it constitutes trial error. Recently, in *State v. Flowers*, 2004 MT 37, 320 Mont. 49, ___ P.3d. ___, we held that an error in failing to exclude a state's witness, though occurring prior to trial, was nonetheless trial error. We concluded that the error was not "of such magnitude that it undermined the fairness of the entire trial proceeding." *Flowers*, ¶ 27. While the

8

District Court here excluded the evidence in a pre-trial order, this was an evidentiary issue which affected the testimony presented to the jury during the trial. Thus, any error manifested itself in the trial process and can be "qualitatively . . . weighed against the admissible evidence introduced at trial." *Van Kirk*, ¶ 38. Further, while Slavin raised a constitutional argument in support of the introduction of the evidence, quashing the subpoenas was not, in and of itself, an issue of constitutional dimension which affected the framework within which the trial proceeded. *Van Kirk*, ¶ 38; *Flowers*, ¶ 27. Slavin does not argue on appeal that the error was structural.

¶21 Trial error is not presumptively prejudicial, but is analyzed to determine whether the error was harmless under § 46-20-701(1), MCA, the harmless error statute. *Van Kirk*, ¶ 40. Slavin asserts that the case against him rested upon Merryfield's credibility, and that his ability to challenge her credibility was diminished without O'Toole and Ring's unbiased testimony. He argues that the error was thus prejudicial, and demonstrates that a reasonable possibility existed that the jury would not have convicted him had O'Toole and Ring testified.

¶22 In response to a claim that error affected the trial outcome, "it then becomes incumbent on the State to demonstrate that the error at issue was not prejudicial." *Van Kirk*, ¶ 42. Here, because the claimed error was a court ruling which excluded testimony, the State must demonstrate there was no reasonable possibility that the exclusion contributed to the conviction.

9

¶23    The State argues that Slavin was not prejudiced because he was able to introduce the same evidence of Merryfield's statements to O'Toole and Ring during Merryfield's cross-examination. Merryfield testified that she had made the statements to the reporters which were attributed to her in the article, and the relevant portion of the article was introduced as an exhibit. The State notes that Slavin made no offer of proof at trial demonstrating the additional evidence he sought to introduce through O'Toole and Ring. Slavin responds that the reporters could have testified to Merryfield's demeanor, her willingness to talk to them and her specific recantations.

¶24    The record indicates that Slavin fully explored the interviews with O'Toole and Ring during his cross-examination of Merryfield. Merryfield testified that she had, indeed, told the reporters that the testimony she had given to police about the incident could have been mistaken. The relevant portion of the article itself was admitted as an exhibit and, during her testimony, Merryfield was asked to read aloud from the article in court. She quoted from the article as follows:

> In an interview with the Chronicle Merryfield said some of the trouble was a misunderstanding that stems from her suffering from epilepsy, temporal lobe seizures. She said that at times she needs to be restrained and that she has known Slavin for 30 years and he is her caregiver. I can't in good conscious say it happened the way the police described it, she said. Even testimony she gave to the police could have been mistaken due to her condition.

¶25    Further, Thielen, Slavin's bail bondsman, testified that Merryfield had told him she had suffered an "episode" that night. Guza, Slavin's attorney, testified that Merryfield had met with him and stated that the incident had not happened. Ohannesian, Merryfield's

10

subsequent caregiver after Slavin, testified that Merryfield had told him that she was drunk on the night of the incident, had gone outside because she had felt hot and confined, and did not remember if anybody else was in the trailer. Springer testified that Merryfield had called him and told him that the altercation between her and Slavin had not occurred and that she had "made it all up." Springer also told the court that Merryfield later contacted him, after Slavin was put back in jail, and told Springer she was reaffirming her original story because Slavin was again in jail.

¶26    There was an abundance of evidence introduced in this trial for Slavin to challenge Merryfield's credibility. O'Toole and Ring's observations about Merryfield's demeanor during the interviews and their versions of her recantations would have added little or nothing to their report in the newspaper article and the other evidence introduced at trial. We conclude that there was no reasonable possibility that any error in excluding their testimony contributed to Slavin's conviction, and affirm the District Court.

## ISSUE TWO

¶27    *Did the District Court abuse its discretion in limiting the testimony of the defendant's expert witness?*

¶28    Slavin challenges the District Court's limitations on Dr. Bach's testimony. Slavin sought leave for Dr. Bach to testify about six instances of Merryfield's prior conduct and about the medical and legal documents upon which he had relied in reaching his opinion that Merryfield may have suffered a seizure on the night in question, for the purpose of assisting the jury in understanding Merryfield's disorder. The District Court permitted Dr. Bach to

11

address two of the six instances specifically, and to testify that he had reviewed Merryfield's file and had based his opinion on her other incidents. The District Court also permitted Dr. Bach to give a general explanation of the nature and symptomatology of Merryfield's disorder, including the effect of her medications and alcohol, but prohibited Dr. Bach from testifying about the specific nature of the other incidents revealed in the documents he had reviewed.

¶29 Slavin argues that the District Court allowed Dr. Bach to testify "only in general terms" about the medical and legal documents he had reviewed, and with the limitation upon the incidents about which Dr. Bach could specifically reference, Dr. Bach was prevented from presenting the full picture to the jury, resulting in unfair trial for Slavin. He argues that the restrictions placed upon Dr. Bach's testimony are inconsistent with this Court's holding in *Benjamin v. Torgerson*, 1999 MT 216, 295 Mont. 528, 985 P.2d 734.

¶30 *Benjamin* involved a civil suit alleging that the defendant had sexually abused the plaintiff. We noted therein that the evidentiary standards under Rule 404(b), M.R.Evid., and the modified *Just* rule, established in *State v. Matt* (1991), 249 Mont. 136, 814 P.2d 52, were equally applicable in the civil context. *Benjamin*, ¶ 17. This Court affirmed the district court's admission of testimony by defendant's experts which referenced several prior untruthful statements by plaintiff that were probative, concluding the evidence did not constitute improper comment upon plaintiff's credibility. *Benjamin*, ¶ 49. We also affirmed the district court's exclusion of plaintiff's evidence of defendant's sexual abuse of other

victims as not satisfying the admissibility requirements of Rule 404(b), M.R.Evid. *Benjamin*, ¶ 24.

¶31 *Benjamin* is instructive but does not require reversal. The district court in *Benjamin* considered the proffered evidence of plaintiff's prior untruthful statements very carefully, admitting testimony about some instances, but excluding others. *Benjamin*, ¶ 47. We noted the discretion given to trial courts in handling this difficult issue:

> The fact that discretion is permitted, infers that there may be more than one permissable [sic] way to resolve an evidentiary issue and that the District Court is in the best position to make that decision. In other words, there is not a purely correct or incorrect answer to every evidentiary issue. This is particularly true regarding evidence of prior acts.

*Benjamin*, ¶ 15.

¶32 Here, the District Court carefully considered each of the incidents about which Slavin sought to introduce evidence, and allowed specific reference to the two incidents in which Merryfield had misrepresented facts to law enforcement, one of which was a previous report Merryfield had made about Slavin. However, mindful of the general prohibition against the introduction of other crimes, wrongs or acts to establish that Merryfield acted in conformance therewith, Rule 404(b), M.R.Evid., the District Court limited Dr. Bach's testimony about the remaining incidents to only a general reference, because none of those incidents involved an untruthful statement by Merryfield.

¶33 This Court will not overturn a district court's evidentiary determination absent an abuse of discretion. *State v. Bingman*, 2002 MT 350, ¶ 31, 313 Mont. 376, ¶ 31, 61 P.3d 153, ¶ 31. Like the trial judge in *Benjamin*, the District Court devised a careful solution that

13

admitted evidence of Merryfield's medical condition and her symptomatology, of the side effects of her medication and alcohol use, of Dr. Bach's general review of her medical and legal documentation, and of two specific incidents which revealed past untruthful statements. Clearly, Slavin was provided an ample opportunity to demonstrate Merryfield's conditions and limitations thereunder in support of the defense theory. We conclude that in limiting Dr. Bach's testimony, the District Court did not abuse its discretion.

¶34 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER

14