DA 11-0763

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 355

STATE OF MONTANA,

Plaintiff and Appellee,

v.

KATIE IRENE GARDING,

Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 10-160
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Wade Zolynski, Chief Appellate Defender; Eileen A. Larkin, Assistant
Appellate Defender; Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General; Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney; Jennifer Clark,
Deputy County Attorney; Missoula, Montana

Submitted on Briefs:   October 16, 2013
Decided:   November 26, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Katie Irene Garding (Garding) appeals from the Judgment entered by the Fourth Judicial District Court, Missoula County, regarding her conviction for the offenses of vehicular homicide while under the influence, failure to stop immediately at the scene of an accident involving an injured person, and driving without a valid driver's license. We affirm and address the following issues on appeal:

¶2     *1.  Did the District Court err by limiting the Defendant's cross-examination of the State's informant?*

¶3     *2.  Did the District Court err by preventing the Defendant's expert forensic pathologist from testifying about matters not disclosed through discovery?*

¶4     *3.  Did the District Court err by permitting an undisclosed expert witness to testify for the State?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5     This case involves the tragic death of Bronson Parsons (Parsons) due to injuries sustained during a hit-and-run vehicle-pedestrian accident in the early morning hours of January 1, 2008.  At approximately 1:40 a.m., Parsons and Daniel Barry (Barry) were walking along the right-hand shoulder of Highway 200 and toward the Reno Casino (the Reno) in East Missoula to participate in the Bar's last call of the night.  When they were about 300 yards from the Reno, a dark-colored SUV struck Parsons from behind and carried him a short distance before he slid off the side of the hood.  The SUV veered off the road, corrected itself, and then accelerated westward toward Missoula.  Parsons remained on his back in the roadway, having sustained fatal blunt force trauma to the back of his head.

2

¶6     In the darkness, Barry was able to identify the fleeing vehicle only as a bigger, dark-colored SUV or truck.  Barry also thought the vehicle had a deer guard or something else reinforcing its frontend.  Deborah Baylor (Baylor), who was driving east along Highway 200 at the time of the collision, saw a dark-colored vehicle strike Parsons with its passenger side.  Baylor explained that she heard a pop or a bang and then saw Parsons fly off the side of the vehicle and land in the roadway.  Neither Baylor nor Barry heard any glass breaking during the accident.

¶7     Trooper Novak of the Montana Highway Patrol soon arrived at the scene and conducted an investigation.  He looked for anything of evidentiary value, such as broken glass or damaged vehicle parts, but was only able to find a set of tire tracks on the shoulder of the road, which he later photographed.  Trooper Novak was not able to precisely identify the point of impact.

¶8     Other law enforcement officers were alerted about the accident, and about ten hours later Trooper Hader of the Montana Highway Patrol stopped Garding to investigate her cracked windshield.  Garding was driving a black 1994 Chevy Blazer with a unique, aftermarket steel bumper protruding from the frontend.  Trooper Hader then believed that the accident had involved a full-frontal crash and that the subject vehicle would have extensive frontend damage.  When Trooper Hader did not observe any such damage, he cited Garding for driving without a license and arrested her boyfriend, James Bordeaux (Bordeaux), who was also in the vehicle, on an out-of-state warrant.  Law enforcement would take no further action against Garding for some time.

3

¶9    Law enforcement initially suspected that Gabrielle Weiss (Weiss) had hit Parsons with her vehicle, a green 1995 S-10 Chevy Blazer, due to an unusual 911 call that she placed around the time of the accident.[1]  During that call Weiss mistakenly identified herself as being in East Missoula that night.  Law enforcement later confirmed that she had actually been in the Blue Mountain area that night.  During the investigation, law enforcement impounded Weiss's vehicle and submitted its bumper to the FBI for laboratory examination.  Although the bumper contained a fabric impression from a pair of jeans,[2] no conclusive results were obtained.  Weiss was not charged and the case went cold.

¶10    On December 22, 2008, almost one year after the accident, Tueray Cornell (Cornell), then an inmate at the Missoula County Detention Center, contacted Trooper Hader to report that he had information about the incident.  Cornell explained that Garding had driven to his house on January 1, 2008, and told him that she had hit a deer.  Cornell used duct tape to repair Garding's broken light cover by taping it back in place.  Following up on this lead, law enforcement discovered that Garding's Blazer had been repossessed and resold.  The new owner explained that the Blazer had broken down almost immediately upon purchase, but otherwise remained in the same condition.  The right front fog lamp was affixed with duct tape.

---

[1] Weiss admitted to being highly intoxicated at the time she called 911.  Her boyfriend had recently been stabbed, and she was attempting to drive him to the hospital.

[2] Weiss testified that her boyfriend, who was wearing jeans, jumped onto the hood of her vehicle during an argument on December 31, 2007.

¶11 Meanwhile, Bordeaux, one of Garding's passengers on the night of the accident and now her ex-boyfriend, was incarcerated in Missoula on a burglary charge. At the omnibus hearing in Bordeaux's case, the State checked the omnibus hearing form to indicate that it intended to pursue a Persistent Felony Offender (PFO) designation under § 46-18-502(1), MCA, against Bordeaux, which would permit a district court to sentence him to up to 100 years in prison. However, the State did not discuss or pursue this possibility further.

¶12 As part of the investigation into Garding, Trooper Hader contacted Bordeaux, who related that on the day of the accident, Bordeaux and Garding started drinking around 11:00 a.m. After several hours of drinking at Red's Bar in Missoula, they met Paul McFarling (McFarling) and drove to East Missoula in Garding's Blazer, drinking Black Velvet and smoking marijuana on the way. The three continued to drink throughout the afternoon and evening, including at the Reno. Sometime after midnight, they drove to Red's Bar in Missoula and remained there until 1:30 a.m. They then returned to East Missoula in Garding's Blazer to try to purchase cocaine. McFarling, who was sitting in the backseat, pulled out a gun and attempted to show it to Garding and Bordeaux. Bordeaux, who was sitting in the front passenger's seat, turned around and started arguing with McFarling, threatening to "slap him" and telling Garding to pull over so he could kick McFarling out of the car. Possibly distracted by these events, Garding struck Parsons from behind with the passenger's side of her vehicle. Bordeaux stated that he spun around in his seat just in time to see a person flying through the air and hear

5

Garding say, "I hit somebody." Garding did not stop the vehicle, but instead drove back to Missoula and stayed the night at McFarling's house.

¶13 In exchange for providing this testimony, the State offered Bordeaux a plea deal whereby he would testify against Garding and plead guilty to the burglary, and in return, the State would recommend that he receive a five-year suspended sentence. The possible PFO designation was not discussed or mentioned in the parties' written plea agreement. Obtaining Bordeaux's cooperation, the State charged Garding with Parsons' death.

¶14 At trial, Garding sought to impeach Bordeaux's credibility. In her opening statement, Garding's counsel stated, "the State wants you to believe that [Bordeaux] did not get any deal for his original sentence. As I mentioned, he was facing 20 years in prison [for burglary], plus an additional 5 to 100 years for being a persistent felony offender." However, when Garding's counsel began her cross-examination of Bordeaux, the District Court granted the State's objection to any mention of the potential PFO designation, limiting the scope of Garding's questioning in this regard to the burglary charge and the contents of the plea agreement.

¶15 The State called the medical examiner, Dr. Gary Dale (Dr. Dale), who testified that the location and size of Garding's bumper was consistent with muscle tearing injuries in Parsons' calves. Garding called Dr. Thomas Bennett (Dr. Bennett), a forensic pathologist, to challenge Dr. Dale's testimony. Dr. Bennett testified that irregular bruising found on the exterior of Parsons' calves would not have been caused by a bumper like Garding's. When asked to explain the muscle tearing discussed by Dr. Dale, the District Court sustained the State's objection that Dr. Bennett's report obtained in

6

discovery had failed to mention muscle tearing and limited Dr. Bennett's testimony to the bruising on Parsons' calves.

¶16 The State also called Alice Ammen (Ammen) from the State Crime Lab to testify about her inspection of the victim's clothing. During cross-examination, Ammen noted that the Crime Lab had the ability to analyze fabric impressions, such as the jeans impression left on Weiss's bumper, although a different section of the lab handled that responsibility. To address this issue further, the State, still in its case in chief, called Debra Hewitt (Hewitt), a fabric-impression expert from the State Crime Lab, who had not previously been listed as a witness. Over Garding's objection, the District Court permitted Hewitt to testify regarding why a fabric impression analysis would not have been probative in this case. According to Hewitt, absent some unique defect or stitching, the lab cannot distinguish between the impressions left by different pairs of jeans, and because the impression found on Weiss's bumper was not unique, the lab did nothing further.

¶17 The jury convicted Garding of vehicular homicide while under the influence, failure to stop immediately at the scene of an accident involving an injured person, and driving without a valid driver's license. She appeals.

**STANDARD OF REVIEW**

¶18 We review a district court's evidentiary rulings for abuse of discretion. *State v. Bonamarte*, 2009 MT 243, ¶ 13, 351 Mont. 419, 213 P.3d 457. A district court "abuses its discretion if it acts arbitrarily or unreasonably, and a substantial injustice results." *Bonamarte*, ¶ 13. However, "[a] district court has broad discretion when determining the

relevance and admissibility of evidence." *State v. Daniels*, 2011 MT 278, ¶ 11, 362 Mont. 426, 265 P.3d 623. In exercising its discretion, a district court remains bound by the Rules of Evidence or other applicable statutes. We review de novo a district court's interpretation of an evidentiary rule or statute. We exercise plenary review for questions regarding constitutional law. *Daniels*, ¶ 11.

## DISCUSSION

¶19    *1. Did the District Court err by limiting the Defendant's cross-examination of the State's informant?*

¶20    Garding argues that the District Court improperly limited her inquiry into Bordeaux's bias or motive to testify falsely by not allowing her to cross-examine Bordeaux about his possible PFO designation. She explains that the possibility of Bordeaux facing 100 years in prison is exactly the kind of bias or motive that should have been made known to the jury. The State counters that the only reference it made to a PFO designation was the check on the omnibus form, but that the matter was not further discussed and the State did not negotiate away a PFO designation in exchange for anything. The plea agreement contains no mention of a PFO sentencing enhancement, and thus the State argues that the District Court properly exercised its discretion to limit Garding's inquiry.

¶21    The "accused's right to demonstrate the bias or motive of prosecution witnesses is guaranteed by the [Confrontation Clause of the] Sixth Amendment," *State v. Gommenginger*, 242 Mont. 265, 272, 790 P.2d 455, 460 (1990) (citations omitted), and the Montana Constitution, Mont. Const. art. II, § 24. The accused's right to confront

adverse witnesses is fundamental. *State v. Parker*, 2006 MT 258, ¶ 20, 334 Mont. 129, 144 P.3d 831 (citing *State v. Clark*, 1998 MT 221, ¶ 20, 290 Mont. 479, 964 P.2d 766; Mont. Const. art. II, § 24). A defendant is to be given "broad latitude" in questioning the credibility and self-interest of witnesses. *On Lee v. U.S.*, 343 U.S. 747, 757, 72 S. Ct. 967, 973-74 (1952). "The Confrontation Clause 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Nelson*, 2002 MT 122, ¶ 19, 310 Mont. 71, 48 P.3d 739 (citing *State v. Jenkins*, 2001 MT 79, ¶ 19, 305 Mont. 95, 23 P.3d 201 (additional citations omitted) (emphasis in original)). A district court maintains broad latitude to limit cross-examination to those issues that are relevant. *Nelson*, ¶ 15. We have explained that "discretion in exercising control and excluding evidence of a witness's bias or motive to testify falsely becomes operative only after the constitutionally required threshold level of inquiry has been afforded the Defendant." *Bonamarte*, ¶ 16.

¶22    In *Nelson*, an informant testified against Nelson after reaching a plea agreement with the Ravalli County prosecutor. *Nelson*, ¶ 11. During Nelson's cross-examination of the informant, the State objected to the scope of Nelson's questions. Nelson explained that he wanted to cross-examine the informant about other charges filed against him in order to establish that the informant had a pattern of reaching plea deals and then testifying against co-defendants. The district court refused to allow this line of questioning. *Nelson*, ¶ 12. On appeal, Nelson argued that the district court's limitation on the scope of his inquiry violated his right to confront his accuser. *Nelson*, ¶ 16. We

9

disagreed, holding that Nelson had been afforded the constitutionally required level of inquiry. *Nelson*, ¶ 19. We found it persuasive that "nothing in the record indicate[d] that Ravalli County offered any plea arrangements to [the informant] based on" his other alleged criminal activity, *Nelson*, ¶ 17, and that Nelson received wide latitude when cross-examining the informant about the actual contents of the plea agreement with Ravalli County, *Nelson*, ¶ 18.

¶23 As in *Nelson*, Bordeaux's plea agreement does not contain any reference to the PFO designation. As the State notes, other than the check on Bordeaux's omnibus hearing form, he was never notified that the State considered him to be a PFO. Garding generalizes that the state "'routinely' uses a PFO designation to encourage a deal," and cites *Nelson* for the proposition that a defendant's right to confront is violated "when a court precludes questioning on the witness's potential for bias or prejudice stemming from his interest in receiving leniency on other charges from the prosecuting office." However, Garding failed to present any evidence that Bordeaux actually received "leniency on other charges" regarding the PFO, as the following exchange between counsel for Garding and the District Court illustrates:

> [Garding:] Your Honor, I'm arguing, though, I don't—we don't have to argue that he received benefit of them not filing for the persistent felony offender. What I'm asking is his state of mind when he was charged with the burglary, what he was facing, the penalties that he was facing, the consequences that he was facing for his motive to go and make a statement.
>
> [District Court:] Well, absent the testimony the only thing I have is the plea agreement. So that's what I'm limited to, the actual motives and—and discussions and focus in this case. Now if there's something else, some other evidence, I'm happy to consider it, but at this point I'm precluding getting into it [possible PFO designation].

¶24 After making this ruling, the District Court, as in *Nelson*, permitted Garding to cross-examine Bordeaux at length about his plea agreement with the State, including the following exchange:

> [Garding:] Okay. And so two days after you provide this statement [about Garding], after your burglary charge has been pending for over two months, you go and enter a guilty plea on the burglary, right?
>
> [Bordeaux:] Yes, ma'am.
>
> [Garding:] Just two days after you give this statement.
>
> [Bordeaux:] Yes, ma'am.
>
> [Garding:] And you get a sentence that does not call for you to go to prison here in Montana, right?
>
> [Bordeaux:] Yes.
>
> [Garding:] And you get a sentence that allows you to be on probation, and you get to walk out those doors, and you've gone back to Missouri, right?
>
> [Bordeaux:] Yes.

Based on our review of the record, it is clear that the District Court afforded Garding sufficiently wide latitude in cross-examining Bordeaux about his bias and motivation to testify falsely to satisfy Garding's right of confrontation. Garding inquired extensively into Bordeaux's burglary charge, his plea agreement, and the timing of his statement against Garding. This inquiry, coupled with the lack of evidence that Bordeaux's plea agreement was motivated in any way by a potential PFO designation, satisfies the constitutional requirement of an effective opportunity for cross-examination. *See Nelson*,

11

¶¶ 15-19.   Based on the foregoing, we hold that the District Court did not violate Garding's constitutional rights, nor did it abuse its discretion in this instance.[3]

¶25   *2.   Did the District Court err by preventing the Defendant's expert forensic pathologist from testifying about matters not disclosed through discovery?*

¶26   Garding argues that the District Court erred by not permitting Dr. Bennett to refute Dr. Dale's testimony about the muscle tearing in Parson's calves.  During trial, Dr. Dale testified that Parsons sustained a "3-inch area of tearing or crushing of the muscle, the calf muscles, in both calves . . . above his heel."  However, when Garding attempted to question Dr. Bennett about this muscle tearing, the District Court sustained the State's objection and limited Dr. Bennett's testimony to the bruising found on Parsons' calves:

> [District Court:]  We're looking at [Dr. Bennett's] opinion number four.  Specifically limit—it specifically states "bruises" when indicating the linkage to the vehicle.
>
> [Dr. Bennett:]  Yes.
>
> [District Court:]  And so that's what you're limited to and not to the tearing of the muscle because that's what was disclosed.
>
> [Dr. Bennett:]  Okay.
>
> [District Court:]  And so you understand that rule.  Okay.
>
> [Dr. Bennett:]  Perfectly fine, judge.  That's the most important part anyway.

.   .   .

---

[3] In her reply brief, Garding shifts the focus of her argument away from her cross-examination of Bordeaux to a discussion about the District Court's ruling on a generic motion in limine filed by the State.  Having reviewed the applicable documents, we find that our analysis in this case appropriately centers on the District Court's decision to limit Garding's cross-examination of Bordeaux at trial, since the PFO issue was ultimately decided at that point.

[District Court:] When you disclose you're generally limited to that area and that's my ruling.

¶27 The State offers little justification, and, after review, we are unable to conclude there was an appropriate legal basis for the District Court's exclusion of Dr. Bennett's testimony. As Garding notes, "defense counsel may not be required to prepare or disclose summaries of witnesses' testimony." Section 46-15-323(8), MCA; *State v. Huerta*, 285 Mont. 245, 253, 947 P.2d 483, 488 (1997) (concluding that it was error to require the defendant to produce summaries of his witnesses' testimony). Section 46-15-323(6)(b), MCA, states that the names and addresses of defense experts, as well as their reports, shall be made available to the prosecutor. This was done here, and Dr. Bennett's report mentions, contrary to the District Court's ruling, Dr. Dale's finding about the muscle tearing. Further, during trial, Garding's counsel advised the District Court that Dr. Bennett would testify about "how people can obtain muscle tears" and "how blunt force trauma can create muscle tears" in accordance with M. R. Evid. 103(a)(2). Thus, we conclude that the District Court abused its discretion in limiting Dr. Bennett's testimony to only Parsons' bruising injuries. We now turn to the question of whether this error was harmless.

¶28 "The first step in conducting [a] harmless-error analysis is to determine whether the error is structural error or trial error." *State v. Stewart*, 2012 MT 317, ¶ 45, 367 Mont. 503, 291 P.3d 1187 (citation omitted). Structural error affects the framework within which the trial proceeds. *State v. Van Kirk*, 2001 MT 184, ¶ 38, 306 Mont. 215, 32 P.3d 735. Structural error is of "constitutional dimensions, precedes the trial, and undermines

13

the fairness of the entire trial proceeding." *Stewart*, ¶ 45. Examples include: errors in the jury selection process, deprivation of the right to counsel, and lack of an impartial trial judge. Structural error is not subject to harmless-error review and is automatically reversible. *Van Kirk*, ¶ 39 (citations omitted). Trial error, on the other hand, typically occurs during the presentation of a case to the jury. It can be reviewed qualitatively for prejudice relative to other evidence introduced during trial and, therefore, is not automatically reversible. *Stewart*, ¶ 45.

¶29 Precluding Dr. Bennett's testimony was not, in and of itself, an error affecting the framework in which the trial proceeded—it "did not contaminate the trial mechanism along the lines that a biased judge, lack of counsel, or a jury-selection error would," *Stewart*, ¶ 45. Thus, any error on the part of the District Court was trial error subject to Montana's harmless error statute. That statute provides, "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial," and "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Section 46-20-701(1), (2), MCA.

¶30 Garding argues that the District Court's decision prejudiced her by barring the jury from properly evaluating whether her bumper "could have or could not have caused Parsons' muscle tearing," thereby preventing her from presenting a complete defense. She further argues that the State capitalized on this exclusion during its closing argument by referencing the muscle tearing several times. Accordingly, Garding asserts that the District Court's decision to limit Dr. Bennett's testimony contributed to her conviction.

14

¶31 In response to a claim that trial error may have contributed to a conviction, it "'becomes incumbent on the State to demonstrate that the error at issue was not prejudicial.'" *State v. Slavin*, 2004 MT 76, ¶ 22, 320 Mont. 425, 87 P.3d 495 (citing *Van Kirk*, ¶ 42). To meet this burden in cases where a court ruling excludes testimony, the State must demonstrate that there was no reasonable possibility that the exclusion contributed to the conviction. *Slavin*, ¶ 22.

¶32 Dr. Bennett was permitted to testify at length about the nature of Parsons' bruises and the features of Garding's bumper:

> The bruises as described on the back and as seen in the photographs would not be caused by a bumper like that in the mechanism as described. That bumper with the square edges and so forth would not produce those irregular marks on the back of the calf. The bruises would be much more characteristic. You would see lines of petechiae and so forth . . . . Again the bruising is not petechiae. There are regular deep bruises we see on the back of the calves. The bluish discoloration and so forth, the blue, it's a curved, smooth surface, not this bumper. . . . [Garding's bumper is] a 3-inch bumper. The skin markings effectively . . . indicate this isn't the bumper.

Dr. Bennett repeatedly testified that Garding's vehicle did not cause the injuries to Parsons' calves. Each time, Dr. Bennett supported his opinion with extensive analysis of the bruising, which he characterized to the jury as "the best way to look for the nature of that instrument [Garding's bumper]," and to the District Court as "the most important part [of his testimony]."

¶33 Although the State mentioned muscle tearing during its closing argument, Dr. Bennett was still allowed to present the most critical aspects of his testimony to the jury—including his ultimate conclusion that Garding's vehicle did not cause the injuries

15

to Parsons' calves. We believe this testimony sufficiently enabled the jury to weigh Dr. Bennett's opinion against Dr. Dale's. Therefore, we conclude that there was no reasonable possibility that Garding's conviction resulted from the District Court's exclusion of this portion of Dr. Bennett's analysis, and the error was harmless.

¶34    *3. Did the District Court err by permitting an undisclosed expert witness to testify for the State?*

¶35    Lastly, Garding argues that the District Court abused its discretion by allowing the State to call Hewitt to testify about fabric impressions analysis when she had not been previously disclosed as a witness. The State acknowledges that it did not disclose Hewitt as a witness,[4] but offers that she was called only to briefly explain why fabric impression evidence from Weiss's bumper was not analyzed after Garding raised the issue on cross-examination of Ammen. Garding counters that the effect of calling a surprise witness is both "devastating and prejudicial."

¶36    A prosecutor, upon request, must provide the defendant with "the names, addresses, and statements of all persons whom the prosecutor may call as witnesses in the case in chief," together with "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case . . . ." Section 46-15-322(1)(a), (c), MCA. If the prosecutor fails to comply with these discovery provisions at any time, the court "may impose any sanction it finds just under the circumstances . . . ." Section 46-15-329, MCA. This statute provides a district court with

---

[4] According to the State, Hewitt was not disclosed because she never produced a report or completed any testing.

16

the flexibility to impose sanctions, but does not mandate automatic exclusion for noncompliance. *State v. Waters*, 228 Mont. 490, 495, 743 P.2d 617, 621 (1987).

¶37 It is generally inappropriate for the State to call an undisclosed expert witness in its case in chief. Here, however, the District Court afforded Garding ample time to interview Hewitt and indicated a willingness to grant more time if necessary. Hewitt's testimony was to a narrow issue and was brief. Garding thoroughly cross-examined Hewitt about the failure to compare the fabric impressions on Weiss's bumper to the clothing of the victim or any other relevant party.

¶38 Further, the State could have called Hewitt as a rebuttal witness to elicit her testimony. "'Rebuttal evidence offered by the State is admissible if it has a tendency to contradict or disprove evidence of the defense.'" *State v. Gardner*, 2003 MT 338, ¶ 36, 318 Mont. 436, 80 P.3d 1262 (citation omitted). "'Rebuttal testimony is proper only if it tends to counteract a new matter offered by the adverse party.'" *Gardner*, ¶ 36 (citation omitted). During her cross-examination of Ammen, Garding asked whether the State Crime Lab had the capability of analyzing fabric impressions, which Ammen answered affirmatively. The State then called Hewitt to address this newly raised issue.

¶39 Garding cites § 46-15-322(6), MCA, for the proposition that "the State is required to disclose the names of rebuttal witnesses 'no later than five days before trial or at a later time as the court may for good cause permit.'" However, this statute applies to witnesses called by the State to rebut affirmative defenses that a defendant has raised and notified the State of pursuant to § 46-15-323(3), (4), MCA. The State did not call Hewitt to rebut any of these defenses. As we have held, "[d]etermining the admissibility of rebuttal

17

testimony is within the sound discretion of the district court . . . ." *State v. Jackson*, 2009 MT 427, ¶ 68, 354 Mont. 63, 221 P.3d 1213.

¶40    The District Court's decision to allow Hewitt to testify did not constitute reversible error.  Hewitt's statements were very brief and Garding fully cross-examined her.  Even if we were to determine that the District Court abused its discretion, such error would be harmless.  *See Stewart*, ¶ 45.  The fact that the State called Hewitt during its case in chief, rather than as a rebuttal witness later, did not prejudice Garding in any way, nor did it contribute to her conviction.

¶41    Affirmed.


                                                            /S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

18