FILED

12/15/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0395

DA 19-0395

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 313N

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

GLEN JOHN GLENN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 18-1173
Honorable Ashley Harada, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      William Boggs, Attorney at Law, Missoula, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant Attorney General, Helena, Montana

      Scott D. Twito, Yellowstone County Attorney, Sarah L. Hyde, Jake Yerger, Deputy County Attorneys, Billings, Montana

Submitted on Briefs:  October 7, 2020

Decided:  December 15, 2020

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Glen John Glenn appeals a judgment entered by the Thirteenth Judicial District Court, Yellowstone County, after a jury found him guilty of one count of felony Strangulation of a Partner or Family Member, in violation of § 45-5-215, MCA, and two counts of felony Partner or Family Member Assault, in violation of § 45-5-206, MCA. Glenn argues that the District Court improperly admitted impeachment evidence disclosed by the State only after the defense rested and that he received ineffective assistance of counsel when his defense attorney mistook the timeline for his alibi defense. We affirm.

¶3 Around 4:00 a.m. on June 17, 2018, Irving Rising Sun awoke to find his adult daughter, Josie Rising Sun, pounding on the door to his house. She was bruised, bloodied, and had marks on her neck. Josie told her father that she had woken up in her residence to find her ex-husband, Defendant Glenn, on top of her and that Glenn began choking her and punching her head. She saw a second, unidentified male beating her visiting adult brother Chris. Unable to locate her phone after the attack, Josie got in her car and drove to her father's house. Irving called the police, who arrived at his house around 4:30 a.m., about an hour and a half from the time of the assault.

2

¶4 Josie provided the officers a statement recounting Glenn's assault. The responding officers brought Josie to a local hospital for medical attention. While Josie was at the hospital, officers located Chris; he was badly beaten and bleeding but refused to give a statement or to request medical assistance. Authorities considered Glenn the primary suspect and charged him on September 17, 2018.

¶5 At trial, Josie elaborated on the events surrounding her assault. She testified that at the time of the assault she had very recently moved back to Montana from out of state; her move was so recent her furniture had not yet arrived. Josie stated only a few people would have known her new address at the time of the assault. Josie further testified her childhood friend Lacey Doney—who is Glenn's sister—was at her house along with Chris during the evening on June 16. Josie remembered Chris and Lacey talking in the kitchen as she fell asleep. When she awoke to Glenn's assault a few hours later, however, Lacey was gone and did not reappear after the assailants had left. Josie also stated she found it strange her dog Oreo did not bark during the assault because she generally barks at people she does not know. Josie later discovered Oreo missing. Josie picked Oreo up a week later from Glenn's sister's house.[1] The investigating officers testified to Josie's injuries, their meeting with Chris, and crime scene photos showing Josie's injuries and the bloodied floors of her house.

¶6 Glenn relied at trial on an alibi defense to which his wife Fran Knows His Gun and their 14-year-old son attested. Fran testified that on June 16, 2018, she and Glenn ran some

---

[1] Glenn has several sisters; it is unclear from the trial transcript if Josie retrieved Oreo from Lacey or from another sister.

errands, but their car broke down on the way home. After pushing it back to their house, they proceeded with their plans to have a bonfire, which lasted into the night. Fran named various people who attended the bonfire. She testified that Glenn remained at the bonfire all night, and the couple went to bed together around midnight or 1:00 a.m. on the 17th. Fran testified she briefly woke up around 6:30 a.m. to check on her baby and that Glenn was in bed at that time; they both got out of bed later in the morning and later attended a barbeque at a family member's house. Fran never saw Glenn leave the house the night of the 16th and testified that, due to a creaky door, she would have woken up if he tried to leave their house while she was sleeping. Their son testified that he mostly remained inside during the bonfire the night of the 16th, went to bed around 1:00 a.m., and did not remember Glenn ever leaving. Glenn did not testify.

¶7     Lacey Doney also testified for the defense. Lacey's account of the evening was largely the same as Josie's, with some notable exceptions. Lacey testified that Josie and Chris had gotten into an argument and "wrestled" the evening of the 16th. Lacey could not remember what the argument was about and, despite being in the same room, she did not actually see it because she was playing video games and did not turn around. When asked by the State if she would have heard someone being struck in the face multiple times, Lacey testified she did not know, due to the volume of the video game and having been drinking that night. Lacey testified that she, Josie, and Chris all fell asleep soon after this argument; Lacey said she woke up and walked home while Josie and Chris were sleeping, apparently before the alleged assault occurred. She did not remember if she locked the door behind her while leaving and never mentioned taking Oreo with her.

4

¶8      The defense then rested, and the court took a recess.  The State informed the Court outside the presence of the jury that it sought to introduce as impeachment evidence recordings of three phone calls between Glenn and his wife Fran taken while Glenn was in jail awaiting trial.[2]  The State explained that it discovered the recordings the Sunday before trial.  It did not disclose them to the defense until the noon recess on the trial's second day because the prosecutor did not think "they would have been relevant until [Fran] testified in the manner that she did."  The State told the court the calls contained conversations between Glenn and Fran in which they both admit to not remembering what happened on the 16th and discuss the need to figure out the events of that day before the trial.  This evidence, according to the State, impeached Fran's detailed testimony regarding Glenn's whereabouts on the 16th and "goes to the heart of whether or not the witnesses called in support of [Glenn's] alibi are being completely truthful."

¶9      Defense counsel explained that in initially preparing Glenn's alibi defense, counsel did not realize the crime was alleged to have occurred during the early morning of June 17. Defense counsel therefore informed Glenn they needed to account for his whereabouts only for the day and evening of the 17th.  Discovering his error a few weeks before trial, counsel informed Glenn of his mistake and their need to account for the 16th as well.  Defense counsel called this a "dumb mistake" that led to Glenn calling Fran to discuss figuring out what happened on the 16th.

---

[2] The State planned to call the Billings Police Department detective who recorded the calls as a rebuttal witness to lay the foundation for the recordings' introduction.  The State had noticed him as a potential witness prior to trial but did not provide the subject matter of his testimony.

¶10 After a brief recess, the District Court ruled that it would allow the relevant portions of the three recordings. Relying on *State v. Dobrowski*, 2016 MT 261, 385 Mont. 179, 382 P.3d 490, the court explained that it did not find the State was using a dilatory or prejudicial tactic but had disclosed the evidence as soon as it became relevant. The court found further that because Glenn was a party to the calls and knew they were being recorded, the defense had notice of their existence even if defense counsel had not been informed of the recordings until the noon recess.

¶11 The three recordings were played for the jury, and closing arguments followed. The State quoted from the recordings in closing when it characterized Glenn's alibi as, "I have no fucking idea what we did." It went on to point out inconsistencies in Fran's testimony. Defense counsel closed by arguing the jail recordings showed only that Glenn had an imperfect lawyer whose initial focus on the wrong date led to the calls and that the State had not presented any evidence of a different version of events. During deliberations, the court denied a jury request to hear the recordings again. The jury found Glenn guilty of all three charges.

¶12 "District courts are vested with broad discretion in controlling the admission of evidence at trial." *Dobrowski*, ¶ 7 (quoting *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561) (internal quotations omitted). A district court's evidentiary rulings are reviewed for abuse of discretion. *State v. Weitzel*, 2000 MT 86, ¶ 24, 299 Mont. 192, 998 P.2d 1154. "A district court abuses its discretion if it acts arbitrarily or unreasonably, and a substantial injustice results." *State v. Garding*, 2013 MT 355, ¶ 18, 373 Mont. 16, 315 P.3d 912 (internal quotations and citations omitted).

6

¶13 We will consider an ineffective assistance of counsel claim on direct appeal only if it is record-based. *State v. Ugalde*, 2013 MT 308, ¶ 28, 372 Mont. 234, 311 P.3d 772 (quoting *State v. Aker*, 2013 MT 253, ¶ 22, 371 Mont. 491, 310 P.3d 506) (internal quotations omitted). When reviewable, such a claim presents a mixed question of law and fact that we review de novo. *Ugalde*, ¶ 28 (citing *Aker*, ¶ 22).

¶14 Section 46-15-322, MCA, imposes on the prosecution certain disclosure duties designed to provide the defense notice and to prevent surprise. *Dobrowski*, ¶ 21 (citing *State v. Stewart*, 2000 MT 379, ¶ 22, 303 Mont. 507, 16 P.3d 391). Relevant here, the statute mandates the prosecutor, upon request, to "make available to the defendant for examination and reproduction . . . (b) all written or oral statements of the defendant." Section 46-15-322(1)(b), MCA. The prosecutor also must provide the defendant, within five days of trial or later if the court permits, "a list of the names and addresses of all persons whom the prosecutor intends to call as rebuttal witnesses to . . . the defense[] of alibi." Section 16-15-322(6), MCA. The duty to disclose this information is continuous. Section 46-15-327, MCA; *Dobrowski*, ¶ 21. The prosecutor does not have a statutory duty to give pre-trial notice of a witness called to impeach the credibility of a defense witness. *Weitzel*, ¶ 31.

¶15 Fran did not provide the State any statement prior to trial. The State therefore argues that it "had no way of knowing [she] would testify so adamantly about the clarity of her recollections" of June 16, 2018. Citing *Weitzel*, the State contends it properly provided notice of the jail phone call recordings as soon as their impeachment relevance became evident—after Fran testified. *See Weitzel*, ¶ 33. In *Weitzel*, the State offered evidence of

7

handgun ownership to rebut the defendant's specific assertion—unknown to the State until trial—that the defendant did not own a handgun. *Weitzel*, ¶ 34. Upholding the admission of the evidence, we concluded, "[i]t would be illogical to hold that the prosecution was under a duty to disclose a list of witnesses intended to rebut a particular defense where the prosecution did not even know about this defense until trial began." *Weitzel*, ¶ 33 (internal quotations and citations omitted).

¶16 Here, the State knew that Glenn intended to rely on an alibi defense. Regardless of how Glenn would present that defense at trial, the conversation with his wife and his recorded statement, "I have no fucking idea what we did," certainly would be relevant to rebutting that defense. Unlike the evidence in *Weitzel*, the recordings also included the defendant's oral statements, which the State had a continuing duty to disclose under § 46-15-327, MCA. The State knew about the recordings roughly 48 hours before trial. Because the recordings were not simply impeachment of Fran's credibility but subject to disclosure under separate statutory requirements, the State was not justified in withholding them until the defense rested.

¶17 We cannot conclude, however, that the District Court's admission of the evidence requires reversal. As the District Court pointed out, the defendant and the witness both were aware of the recordings and the conversations they contained. The recordings did not contain direct evidence that Fran was giving false testimony or being coached by her husband. Defense counsel argued in closing that the recordings showed only that Fran, like most people, did not initially remember the events occurring months ago on a mundane Saturday afternoon. The recordings were relevant to impeach the clarity of Fran's

8

recollections, but they should not have come as a surprise and were not unfairly prejudicial. We conclude that their introduction in rebuttal did not cause a substantial injustice.

¶18　The Sixth and Fourteenth Amendments to the United States Constitution and Article II § 24 of the Montana Constitution guarantee a defendant's right to the effective assistance of counsel. *Hammer v. State*, 2008 MT 342, ¶ 10, 346 Mont. 279, 194 P.3d 699. To succeed on a claim that his counsel was ineffective, Glenn must demonstrate both: "(1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861 (citing *State v. Racz*, 2007 MT 244, ¶ 22, 339 Mont. 218, 168 P.3d 685); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To satisfy the second prong of *Strickland*, a defendant "must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Morgan*, 2003 MT 193, ¶ 9, 316 Mont. 509, 74 P.3d 1047 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). The probability must be high enough to undermine confidence in the outcome. *Hammer*, ¶ 11 (citing *Morgan*, ¶ 9).

¶19　Glenn argues that his counsel's initial confusion regarding the timing of the offense precipitated Glenn calling Fran to discuss his alibi. Had counsel gotten the timing right in the first place, Glenn reasons, the calls never would have been made and thus never admitted. Without deciding whether counsel's mistake constituted deficient performance, the jail calls do not undermine our confidence in the results. First, the events Glenn and his wife discussed did not reveal an attempt to fabricate an alibi as opposed to an effort to

recall the events of the day. More pointedly, they did not pertain directly to the time of the offense. The assault happened between 3:00 and 4:00 a.m. on June 17. Neither alibi witness saw Glenn during this time; both testified they were sleeping. Fran's testimony that placed Glenn in their house that morning was not about what occurred the day or evening of the 16th—the subject of their phone conversation. Rather, what placed Glenn in their bed during the assault was Fran's testimony that 1) she and Glenn fell asleep together and 2) had Glenn left while she was sleeping, a creaking door would have awoken her. The jail calls do not affect any of this testimony because Glenn and Fran never discussed events covering those hours of the morning.

¶20 Beyond Glenn's failure to show that the conversations affected his alibi for the time during which the assault occurred, he overlooks the totality of the trial record. Lacey was one of the few people who knew Josie's new address. Implicitly trying to pin the blame for Josie's injuries on Chris, Lacey presented odd, if not contradictory, testimony about the alleged argument between the siblings. The fight occurred right behind her, but she did not turn to see it. The fight was loud enough for her to hear "wrestling" sounds, but the video game was too loud for her to hear if any serious blows were landed. She never testified that either Josie or Chris sustained any injuries, let alone injuries explaining the bloodied floor.[3] A jury properly could find this testimony unbelievable or irrelevant to the later assault. Josie's testimony, on the other hand, described a brutal assault, consistently

___

[3] Even assuming Lacey's testimony was meant only to provide a motive for Chris to later assault Josie, Glenn offered the jury no explanation how Josie could have inflicted on Chris the injuries he sustained.

naming Glenn as her attacker. Lacey's presence at the house provides a compelling explanation for how Glenn found and entered the residence. Further, Lacey's departure before the assault is highly coincidental, as is Glenn's sister's possession of Oreo. Considering the totality of the trial evidence, Glenn has not demonstrated a reasonable probability that the jury would have reached a different outcome without introduction of the recorded conversations.

¶21 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court did not commit reversible error in admitting the three recorded jail phone calls, and Glenn failed to demonstrate that his counsel's allegedly deficient performance was sufficiently prejudicial to undermine confidence in the jury's verdict. The District Court's judgment is therefore affirmed.

/S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON